

DA 07-0481

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 419

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

BILLY EUGENE DODSON,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-2006-459
Honorable Robert L. Deschamps, III, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jim Wheelis, Chief Appellate Defender; Helena, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General, Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

          Fred Van Valkenburg, Missoula County Attorney; Betty T. Wing, Deputy
County Attorney, Missoula, Montana

Submitted on Briefs:  December 17, 2008

Decided:  December 8, 2009

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      On April 27, 2007, Billy Eugene Dodson (Dodson) was convicted by a jury of the following offenses in the Fourth Judicial District Court:  Count I, misdemeanor theft; Count II, felony deceptive practices; Count III, issuing a bad check (a felony); and Count IV, theft by deception or deprivation of property (a felony).  Dodson now appeals his conviction.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      On October 6 and 17, 2004, the Missoula County Sherriff's Office (MCSO) received reports from several individuals that their vehicles had been broken into while parked at the trailhead to the Rattlesnake Recreational Area in Missoula County.  The individuals reported that items were stolen from their vehicles, including credit and debit cards.  One of the victims, Janna Herman (Herman), reported that her missing credit card had been used at a Lowe's in Missoula to purchase $708.99 worth of goods.  Herman also reported her debit card had been used to charge $159.00 in gas and merchandise at a Conoco convenience store in Missoula.  Further investigation showed that the credit cards of two other victims, Connie Tuttle (Tuttle) and Susan Kerns (Kerns), had also been used to purchase several thousand dollars of various types of merchandise at stores throughout Missoula.

¶3      Sherriff's Detective Rick Newlon (Det. Newlon) of the MCSO conducted an investigation into these reports.  Det. Newlon reviewed a security camera at Lowe's and some of the other locations where purchases had been made using the victims' credit and debit cards.  Det. Newlon was able to formulate a description of the individual making

the purchases as well as a rough description of the cars the individual was driving. Based on his investigation, Det. Newlon put out an attempt to locate for two vehicles which he observed in the surveillance tapes.

¶4     Approximately 45 minutes after the attempt to locate was issued, Deputy Hartsell pulled over a vehicle matching the description of the vehicle identified on the surveillance tape from Lowe's. The vehicle was a gray 1985 Oldsmobile. The driver of the vehicle was identified as Ben Wilton (Wilton). Wilton agreed to a search of the vehicle. Deputy Hartsell discovered receipts of purchases which later turned out to be made on the stolen credit cards. Wilton told Deputy Hartsell that an individual named "Mike Arnett" lived with him at 408 Rock Creek Road in nearby Clinton, Montana. Wilton told Deputy Hartsell that Mike Arnett had told him that he had broken into cars parked at the Rattlesnake trailhead, and then used the credit cards to buy tools at local stores and then sold them to individuals who needed tools.

¶5     Det. Newlon interviewed the landlord at 408 Rock Creek and confirmed that Wilton and "Mike Arnett" had rented a cabin there. Furthermore, it was discovered that "Mike Arnett" was expecting a box of checks from Missoula Federal Credit Union to be sent to the Rock Creek address. The landlord was able to describe Wilton's vehicle to Det. Newlon, and also described a yellow Cadillac which she believed belonged to either Wilton or "Mike Arnett."

¶6     On October 23, Det. Newlon discovered that "Mike Arnett" was actually Dodson, and that Dodson had absconded from federal probation in the state of Washington. Det. Newlon was able to interview Dodson's girlfriend at the time, Laramie Jorgenson

3

(Jorgenson), and learned that Dodson had recently purchased a 1989 GMC pickup from DeMarois Oldsmobile in Missoula for $3,800. Dodson purchased the pickup with stolen traveler's checks using the name "Mike Arnett." Subsequent investigation revealed that the real Mike Arnett was currently serving time in a federal prison in Arizona. Dodson and Arnett had shared a prison cell while both men were incarcerated in October 2003, and January to March 2004.

¶7    Det. Newlon continued his investigation in Missoula County, and gathered information and evidence related to Dodson's alleged purchases on the stolen credit cards. On October 26, the landlord at Dodson's address on Rock Creek informed Det. Newlon that she received a letter addressed to Arnett with a return address in Lynnwood, Washington. Det. Newlon later obtained this letter from the landlord. Det. Newlon contacted authorities in Washington and relayed this information to them. Dodson's federal probation officer Michael Larson (Officer Larson) conducted a search of Dodson's residence in Lynnwood, Washington, as well as the 1989 GMC pickup truck which was parked there. The search produced a number of items of incriminating evidence which connected Dodson to the crimes committed in Missoula County. Dodson was arrested that same day and placed into custody.

¶8    After his arrest, Dodson was sent to a federal prison in Beaumont, Texas, for federal probation violations. On January 7, 2005, Missoula County charged Dodson with three felonies and one misdemeanor, and the Missoula County Justice Court issued a warrant for his arrest. The warrant was subsequently transmitted to Dodson at the federal prison. On November 15, 2005, Dodson filed a request for a speedy trial under the

4

Interstate Agreement on Detainers Act (IAD) with the officials at the federal prison in Texas. The IAD is codified in Montana at Title 46, chapter 31, MCA. The purpose of the IAD is to encourage the expeditious and orderly disposition of outstanding charges against a prisoner held outside the charging jurisdiction, and facilitate a determination of the proper status of any detainers based on untried indictments, informations, or complaints. *State v. Seadin*, 181 Mont. 294, 297, 593 P.2d 451, 453 (1979) (discussing *United States v. Mauro*, 436 U.S. 340, 343-44, 98 S. Ct. 1834, 1838 (1978)). The IAD describes the procedures by which a state may obtain trial for a prisoner incarcerated in another jurisdiction. *Seadin*, 181 Mont. at 297, 593 P.2d at 453. The IAD is triggered once a detainer is filed with the custodial state of the prisoner (here, Texas), by the state seeking the prisoner (Montana).

¶9     Article III of the IAD contains a speedy trial provision which reads in pertinent part as follows:

> (1) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within 180 days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint; provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole

eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.

(2) The written notice and request for final disposition referred to in subsection (1) hereof shall be given or sent by the prisoner to the warden, commissioner of corrections, or other official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested.

Section 46-31-101, MCA.

¶10 Montana did not receive Dodson's speedy trial request because officials at the federal prison in Texas failed to forward it. Sometime in spring 2006, Dodson talked with federal prison officials about his detainer and learned that his speedy trial request had not been forwarded to Montana. Prison officials reportedly offered him another opportunity to file his request, but he declined to do so. Dodson subsequently filed a pro se motion to dismiss the charges against him in Missoula County Justice Court. Dodson claimed the State's failure to bring him to trial in Montana within 180 days of filing the charges against him required dismissal of those charges under the IAD. The State opposed Dodson's motion on the grounds that it never received a speedy trial request under the IAD from Dodson. The State claimed that Dodson failed to properly file his request. The Justice Court agreed and denied the motion.

¶11 On November 14, 2006, Dodson made his first appearance in District Court in Montana. On January 5, 2007, the State filed a notice of its intent to seek increased punishment under the persistent felony offender (PFO) statute based on Dodson's alleged conviction of federal firearms violations under the alias "Michael Arnett" in Wyoming. Dodson filed an objection to the PFO notice, arguing that the actual Michael Arnett—not

6

Dodson—had been convicted on these charges. After it was determined that Dodson had not in fact been sentenced on these charges in Wyoming, the State filed an amended notice on February 28, 2007. The amended notice sought to sentence Dodson as a PFO based on his conviction for federal charges of possession of stolen mail in December 2000. Dodson objected to the amended notice on the grounds that it was filed after the omnibus hearing, which had been held on December 19, 2006.

¶12 On January 25, 2007, Dodson filed a motion to suppress the evidence obtained from the search of the residence in Lynnwood, Washington, and the GMC pickup truck. Dodson argued that the officers lacked the authority to search the Lynnwood, Washington, residence because they did not have probable cause to believe he was living there. Instead, Dodson claimed that an individual named Mark Day (Day) actually resided there, not Dodson. Dodson also argued that the officers could not search the pickup because there were no objective facts demonstrating a nexus between his alleged probation violation and the search of the car.

¶13 A hearing on the motion to suppress was held on March 19, 2007. At the hearing, Officer Larson testified from Washington State via Vision Net. Prior to the hearing, Dodson had objected to Officer Larson's testimony in this manner. The District Court overruled the objection and allowed the testimony. At the conclusion of the hearing, the District Court denied the motion to suppress from the bench.

¶14 The District Court also granted a motion by the State to file an Amended Information against Dodson. The State had sought to add a count of felony theft by deception based on Dodson's purchase of the GMC pickup truck with the use of stolen

traveler's checks. Additionally, the State sought to add allegations to the theft charge in Count I, and Count II, felony deceptive practices by common scheme. These additional allegations were related to Dodson's alleged theft of a palm pilot owned by Chip and Lynn Rinehart (Rineharts), as well his use of the Rineharts' credit cards. During the search of Dodson's residence and pickup conducted in Washington, the police retrieved a palm pilot belonging to the Rineharts. The Rineharts had previously reported to law enforcement officials in Granite County that the palm pilot, as well as credit cards and cash, had been stolen from their vehicle in September 2004, when they had been visiting the ghost town of Garnet. Granite County officials had subsequently determined that the credit cards had been used by Dodson to purchase over $1,000 of merchandise at stores in Missoula.

¶15 The Granite County Attorney had charged Dodson with felony theft and forgery in Granite County on December 21, 2004.[1] As he did with the Missoula County charges, Dodson filed a motion to dismiss the Granite County charges under the IAD based on the State's failure to bring him to trial in Montana within 180 days after his request for a speedy trial. Dodson successfully had these charges dismissed in Granite County on September 22, 2006, before he could be brought to trial.

¶16 Nevertheless, the Missoula County Attorney sought to incorporate some of the factual allegations set forth in the Granite County charges into those charges filed against Dodson in Missoula County, since Dodson had used the Rineharts' credit cards at stores

---

[1] The information filed against Dodson in Granite County also contained allegations of other instances of theft, forgery and fraud, based on other crimes committed against other individuals.

8

in Missoula. At the conclusion of the suppression hearing, the District Court granted the State leave to amend the information in the manner it requested.

¶17 Dodson's trial in Missoula County was scheduled to commence on April 25, 2007. On April 23, 2007, Dodson filed a motion to dismiss the charges based on the State's failure to comply with the IAD, a motion to strike portions of the Amended Information, and a motion in limine. The motion to dismiss sought to dismiss all the charges against him due to the State's failure to bring him to trial in Montana within 180 days of his request for a final disposition of the pending charges pursuant to the IAD. Dodson argued that he did all he was required to do by submitting his request to the federal prison authorities in November 2005, and that the federal prison officials' failure to forward the request to Montana cannot be held against him. Dodson argued that the charges must be dismissed under the IAD and this Court's decision in *Seadin*.

¶18 In the motion to strike, Dodson sought to strike portions of the Amended Information related to charges which had been previously dismissed in Granite County. Dodson argued that since the Granite County charges had been dismissed, the factual allegations in support of those charges could not be incorporated into those pending in Missoula County. Dodson argued that it violated his right to be free from Double Jeopardy under the Montana and United States Constitutions to allow these allegations to be considered. Accordingly, Dodson sought to strike those portions of the Amended Information related to his theft of property and use of credit cards belonging to the Rineharts. Dodson also sought a motion in limine precluding any testimony or evidence related to these allegations.

9

¶19     On April 24, the District Court considered the motions. Regarding the motion to dismiss, the District Court denied this motion on double jeopardy grounds, reasoning that such concerns were not present since jeopardy had not yet attached to the charges in Granite County. The District Court considered oral argument from counsel on Dodson's other motions, and then took the remaining matters under advisement.

¶20     On the morning of trial, the District Court ruled on the pending motions. The District Court denied the motion to dismiss for the State's failure to comply with Dodson's speedy trial request under the IAD. The District Court noted that it did not receive notice of Dodson's motion to dismiss under the IAD until April 23, 2007. Under *State v. Wolfe*, 250 Mont. 400, 821 P.2d 339 (1991), the District Court concluded that the court itself must have notice of the request before the 180-day speedy trial clock under the IAD began to run. The District Court noted that it could have moved the trial up if it had been notified of the speedy trial motion at an earlier date. Thus, it concluded there was no basis to dismiss the charges for failure to comply with the IAD.

¶21     At this time, the District Court also ruled on Dodson's challenge to the late PFO notification. *See Opinion*, ¶ 11. The District Court allowed the PFO designation to be considered in sentencing, holding that the notice was not defective because even though the notice was amended after the omnibus hearing, Dodson still had more than adequate time to object and contest the use of the prior conviction for sentencing purposes. The District Court relied on *State v. McQuiston*, 277 Mont. 397, 922 P.2d 519 (1996), *overruled on other grounds by State v. Herman*, 2008 MT 187, 343 Mont. 494, 188 P.3d 978, in reaching this conclusion.

10

¶22 Finally, the District Court ruled that the State could mention at trial that Dodson was arrested and his premises searched in Washington, but could not mention that the underpinning for the search was the fact that he was on federal probation, nor could the State mention that he was arrested by a federal probation officer.

¶23 During trial, the State presented evidence from Det. Newlon, Officer Larson, and many of the alleged victims. During the testimony of Connie Tuttle, she inadvertently mentioned that Officer Larson was a "parole officer," and was the individual who returned her stolen items to her in Montana. Dodson's trial counsel immediately objected, and the District Court admonished the jury to disregard anything other than the fact that "she received [her property] from somebody named Mike Larson of out Seattle." Later in the proceedings, outside the presence of the jury, Dodson's counsel moved for a mistrial based on Tuttle's statement about Officer Larson being a "parole officer." The District Court denied the motion for a mistrial.

¶24 Dodson was found guilty of misdemeanor theft, felony deceptive practices, and the felonies of issuing a bad check and theft by deception or deprivation of property. These felony charges carry a maximum sentence of 10 years each. Dodson was ultimately sentenced as a PFO, which increased the maximum range of imprisonment. Dodson was given 80 years sentences, with 25 years suspended, on each of the felony convictions.[2] Dodson also received 6 months for misdemeanor theft. The sentences were ordered to run concurrently.

---

[2] In *State v. Gaither*, 2009 MT 391, ___ Mont. ___, ___ P.3d ___, we recently held that the PFO statutes do not give district courts the authority to "mix and match a PFO sentence with another

¶25 Dodson now appeals his conviction. First, he claims that the District Court committed fundamental, structural error by denying his motion to dismiss based on the State's claimed failure to comply with the IAD. Second, he argues that the District Court also committed fundamental, structural error by permitting Officer Larson to testify remotely via Vision Net. Third, he argues the District Court erred in denying his motion to suppress. Fourth, Dodson claims that the District Court committed error when it denied his motion to strike a portion of the charges related to the previously-charged offenses in Granite County, and permitted the admission of evidence regarding the same. Fifth, Dodson contends that the District Court erred when it denied his motion for a mistrial. Sixth, Dodson asserts that the District Court erred when it allowed the admission of evidence obtained from his landlord at the Rock Creek cabin. Lastly, Dodson claims that the District Court erred when it allowed the State to seek his designation as a PFO, and that the notice of the PFO designation did not follow the required statutory criteria. On the basis of these claimed errors, Dodson asserts that his conviction must be reversed.

¶26 Rule 12(1)(f) of the Montana Rules of Appellate Procedure requires that an appellant's argument "shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes, and pages of the record relied on . . . ." This Court has the discretion to decline to consider

felony conviction occurring in the same proceeding and exceed the 100-year limit for imprisonment." *Gaither*, ¶ 54. In this case, the District Court imposed 80 year sentences for each of the felony convictions pursuant to the PFO statutes. Because these sentences ran concurrently, they are lawful. However, if the District Court had ordered the sentences to run consecutively, the 100-year limitation on imprisonment would have been exceeded.

arguments which do not comply with the requirements of M. R. App. 12(1)(f). *See State v. Cybulski*, 2009 MT 70, ¶¶ 13, 15, 349 Mont. 429, 204 P.3d 7. After a review of Dodson's appellate briefs and the record on appeal, we conclude that Dodson's challenges to the denial of his motion for a mistrial and his objection to the admission of the evidence obtained from his landlord at the Rock Creek residence do not comply with the requirements of M. R. App. 12(1)(f) and will not be considered on appeal. We state the remaining issues on appeal as follows:

¶27    **Issue One:** *Did the District Court err in denying the motion to dismiss for failure to comply with the speedy trial provisions of the IAD?*

¶28    **Issue Two:** *Did the District Court err when it denied Dodson's motion to strike portions of Count II, deceptive practices by common scheme?*

¶29    **Issue Three:** *Did the District Court err when it denied Dodson's motion to suppress and allowed Officer Larson to testify via Vision Net?*

¶30    **Issue Four:** *Did the District Court err by allowing the State to seek designation of Dodson as a PFO in this case?*

### STANDARD OF REVIEW

¶31    The denial of a motion to dismiss in a criminal trial presents a question of law which we review to determine if the district court's conclusion of law is correct. *State v. McWilliams*, 2008 MT 59, ¶ 22, 341 Mont. 517, 178 P.3d 121. We exercise plenary review over decisions involving constitutional law, including those related to double jeopardy claims, and review a district court's conclusions of law for correctness. *State v. Martinez*, 2008 MT 233, ¶ 16, 344 Mont. 394, 188 P.3d 1034.

13

¶32 A district court's ruling on a motion to suppress and rulings generally related to the admission and consideration of evidence are reviewed for an abuse of discretion. *State v. Gardner*, 2003 MT 338, ¶ 21, 318 Mont. 436, 80 P.3d 1262. An abuse of discretion occurs when a trial court acts arbitrarily, without the employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. *Christofferson v. City of Great Falls*, 2003 MT 189, ¶ 14, 316 Mont. 469, 74 P.3d 1021.

¶33 **Issue One:** *Did the District Court err in denying the motion to dismiss for failure to comply with the speedy trial provisions of the IAD?*

¶34 Dodson claims the District Court erred in denying his motion to dismiss. He contends that he took the necessary steps to trigger the speedy trial provisions of the IAD when he completed his request with the federal prison authorities and pressed the authorities in Texas to forward the request to Montana. Dodson acknowledges that he did not file a second IAD request once he learned that the federal prison authorities in Texas had failed to forward his first request to Montana. However, he asserts the District Court in this case had notice of his intent to dismiss because he filed his motion in Justice Court in August 2006, more than 6 months before his trial in District Court. Further, Dodson argues that he was never questioned by the District Court or the State as to why he did not file a second request, and suggests that if he had filed a second request he would have waived any speedy trial claim based on the first request which had been legitimately filed. Dodson argues his speedy trial motion is supported by *Seadin*, and that the District Court's denial of his motion under *Wolfe* was misplaced.

14

¶35 The State urges us to affirm. The State argues that *Seadin* is distinguishable and that *Wolfe* and *Fex v. Michigan*, 507 U.S. 43, 113 S. Ct. 1085 (1993), support the District Court's decision. The State argues under *Fex* that the 180-day speedy trial clock provision of the IAD should not begin to run until the prosecutor and court have received the IAD request. Once Dodson learned that the authorities in Montana did not receive his speedy trial request, the State argues Dodson should have taken further steps to send his request to the prosecutor and the District Court. Instead, the State claims that Dodson did nothing, and in fact waited until 2 days before trial to file a motion to dismiss based on his speedy trial request under the IAD. The State dismisses the argument that the District Court had notice of the speedy trial request based on the motion to dismiss filed in Justice Court. The State claims the IAD requires Dodson to give written notice of his request for a final disposition of his case to the District Court and prosecutor, and that he failed to take this step until 2 days before trial.

¶36 This issue was previously addressed in *Fex*. In *Fex*, an individual incarcerated in Indiana on unrelated offenses (Fex) was charged with armed robbery, possession of a firearm, and assault in the state of Michigan. The county attorney in Michigan lodged a detainer against Fex with the prison authorities in Indiana. Fex, like Dodson here, filed a speedy trial request under the IAD with the prison authorities in Indiana. There was a delay of roughly two weeks between the time Fex filed his request with the prison authorities in Indiana, and the time the Indiana authorities actually forwarded the request to Michigan. Due to the delay, Fex was not brought to trial in Michigan until after the 180-day period under the IAD had elapsed. Fex moved to dismiss the Michigan charges

15

for failure to comply with the IAD's speedy trial provisions. The Michigan courts denied his motion to dismiss, and Fex appealed to the United States Supreme Court. *Fex*, 507 U.S. at 46, 113 S. Ct. at 1088.

¶37 The *Fex* court stated the determinative issue in the case as follows:

> The outcome of the present case turns upon the meaning of the phrase, in Article III(a) [of the IAD], "within one hundred and eighty days after he shall have caused to be delivered." The issue, specifically, is whether, within the factual context before us, that phrase refers to (1) the time at which petitioner transmitted his notice and request (hereinafter simply "request") to the Indiana correctional authorities; or rather (2) the time at which the Michigan prosecutor and court (hereinafter simply "prosecutor") received that request.

*Fex*, 507 U.S. at 47, 113 S. Ct. at 1088.

¶38 The Supreme Court ultimately concluded that it was the court and prosecutor's receipt of the prisoner's notice, as opposed to any actions taken by the prisoner, which triggered the 180-day speedy trial provision of the IAD. *Fex*, 507 U.S. at 52, 113 S. Ct. at 1091. The court gave several reasons for this conclusion. First, the court determined that triggering the 180-day speedy trial clock on the basis of the prisoner's actions—i.e., when the prisoner first "caused" the notice to be delivered—would make little sense because this precise point in time is difficult to determine. Instead, the proper trigger should be measured by the point at which the notice was actually "delivered."

> If one seeks to determine the moment at which a prisoner "caused" the later delivery of a properly completed request, nothing in law or logic suggests that it must be when he placed the request in the hands of the warden. Perhaps it was when he gave the request to a fellow inmate to deliver to the warden—or even when he *mailed* it to the warden (Article III(b) provides that the request "shall be given *or sent* by the prisoner to the warden" (emphasis added)). It seems unlikely that a legislature would select, for the starting point of a statute of limitations, a concept so indeterminate as

16

> "caused." It makes more sense to think that, as respondent contends, delivery is the key concept, and that paragraph (a) includes the notion of causality (rather than referring simply to "delivery" by the prisoner) merely to be more precise, anticipating the requirement of paragraph (b) that delivery be made *by the warden* upon the prisoner's initiation. (Emphasis in original.)

*Fex*, 507 U.S. at 49, 113 S. Ct. at 1089.

¶39 The court also determined that the wording of the IAD favored reliance upon when the notice was delivered to the court and prosecutor, as opposed to when the delivery was made to the warden of the prison. While the negligence or malice of a warden could result in a delay of a detainer, and cause delays and negative hardships upon a prisoner, this result was "no worse than what regularly occurred before the IAD was adopted . . . ." *Fex*, 507 U.S. at 50, 113 S. Ct. at 1090. And although the unnecessary detriment to the prisoner was not to be favored or condoned, it would be equally unfair to subject the receiving state to the risk that it would lose its case against a prisoner before it was ever informed of the prisoner's request for trial. *Fex*, 507 U.S. 50-51, 113 S. Ct. at 1090.

¶40 Finally, the *Fex* court determined that the text of Article III of the IAD confirmed the view that the requesting state's receipt of the notice, and not any other event, started the speedy trial clock. Article III(b) requires the warden to forward the prisoner's request and accompanying documents "by registered or certified mail, return receipt requested." *Fex*, 507 U.S. at 51, 113 S. Ct. at 1090. In other words, the IAD requires documentary certification from the *requesting state* not the *warden*, thus indicating that the transmission of the request to prison officials was not a determinative event.

17

Additionally, the *Fex* court noted that the IAD was "indifferent" to the manner of transmittal to the warden, stating that the request "shall be given or sent by the prisoner to the warden." As the court reasoned, if the transmittal to the warden was the determinative event for triggering the 180-day speedy trial clock, then the IAD would specify the parameters of this event with greater precision, instead of expressing a "strange nonchalance" to the manner in which the warden received the request. *Fex*, 507 U.S. at 51, 113 S. Ct. at 1090-91. For these reasons, the *Fex* court denied the prisoner's appeal, and concluded that the speedy trial provisions of the IAD were not triggered until the court and prosecutor in the requesting state received notice of the speedy trial request in conformity with the provisions of Article III of the IAD.

¶41 We agree with the United State Supreme Court's interpretation of the IAD in *Fex*. The speedy trial clock provisions of the IAD are not triggered until the prosecutor and court receive the prisoner's request for a speedy trial pursuant to the strictures of the IAD. There may be instances, such as the case sub judice, where the delay occasioned from the custodial state's failure to forward the request may cause harm or detriment to the prisoner. However, such institutional delays against the custodial state should not be charged against the requesting state which has no notice of the delay, or control over the institution causing it. One simply cannot say that a requesting state has a duty under the IAD to bring a prisoner incarcerated in another state to trial until it receives notice of the prisoner's request to invoke the IAD's speedy trial provisions.

¶42 In adopting the Supreme Court's reasoning in *Fex*, we affirm the District Court's decision to deny Dodson's motion to dismiss. Irrespective of the applicability of *Seadin*

or *Wolfe*, the fact remains that Dodson did not inform the District Court and prosecutor of his request for a speedy trial under the IAD until 2 days before trial, and that the 180-day speedy trial provision of the IAD was not violated.

¶43    **Issue Two:** *Did the District Court err when it denied Dodson's motion to strike portions of Count II, deceptive practices by common scheme?*

¶44    Two days before trial, Dodson filed a motion to strike portions of Count II (deceptive practices by common scheme) of the Amended Information on double jeopardy grounds. In particular, Dodson sought to strike those portions of the Amended Information which stated allegations that had been set forth in the previously-dismissed Granite County charges. Under § 46-13-101(1), MCA, Dodson was required to file this motion at or before the omnibus hearing. Failure to do so, constitutes a waiver pursuant to § 46-13-101(2), MCA. The State argues that Dodson's untimely filing of the motion constituted a waiver this defense. We agree, and conclude the District Court did not err in denying the motion.

¶45    Furthermore, as the State notes, the allegations in Count II charged the felony of deceptive practices by common scheme. In addition to the allegations which had been raised against Dodson in the Granite County charges for his use of the Rineharts' credit cards, there were also allegations that Dodson stole the credit cards of three other women and used them to purchase items at stores in Missoula. Even if the allegations described in the Granite County charges had been stricken, we agree with the State that there was still overwhelming evidence to convict Dodson of this charge.

¶46    **Issue Three:** *Did the District Court err when it denied Dodson's motion to suppress and allowed Officer Larson to testify via Vision Net?*

19

¶47 Dodson argues that the District Court erred when it denied his motion to suppress evidence seized from the Lynnwood residence. Dodson claims that the Lynnwood residence was not actually his residence at the time the federal probation officers searched it. Instead, he claims that he had given his probation officer an address in Seattle by that time which represented his actual address. Furthermore, Dodson claims that he was prejudiced by the District Court's decision to allow Officer Larson to testify via Vision Net at the hearing.

¶48 In reply, the State claims the District Court did not err in concluding that Dodson was residing at the Lynnwood residence at the time Officer Larson conducted a federal probation search. First, it notes that Dodson had listed the Lynnwood address as his "release address" on his federal supervised release form, and had never submitted the proper paperwork to change this address with federal authorities. Second, when Officer Larson arrived at the Lynnwood residence, Dodson had a room there in which boxes of his belongings were stored. Third, when Dodson left Montana, he provided the Lynnwood address as a forwarding address. Fourth, officers had observed Dodson at the Lynnwood address while conducting surveillance. Additionally, the State notes that Dodson has failed to demonstrate how Officer Larson's testimony via Vision Net caused him prejudice.

¶49 The District Court's determination that Dodson was residing at the Lynnwood address at the time Officer Larson conducted the search was supported by substantial evidence. Dodson has failed to demonstrate that the District Court committed clear error

in its findings. Thus, we affirm the District Court's denial of Dodson's motion to suppress.

¶50 Furthermore, we agree with the State that Dodson has not demonstrated how Officer Larson's testimony via Vision Net prejudiced him. We hold that the District Court did not abuse its discretion when it allowed Officer Larson to testify via Vision Net.

¶51 **Issue Four:** *Did the District Court err by allowing the State to seek designation of Dodson as a PFO in this case?*

¶52 Finally, Dodson argues the District Court erred by allowing the State to file of an amended notice of its intent to seek sentencing of Dodson as a PFO. Dodson correctly notes that the State indicated its intent to seek a PFO designation at the omnibus hearing, but did not specify the previous offenses which allowed it to seek the PFO designation. The statutory notice of the specific offenses was not provided until after the omnibus hearing. Once filed, the notice was defective because the State mistakenly attributed a previous crime committed by the real Mike Arnett to Dodson. The PFO notice was subsequently amended, and the State notified Dodson on February 28, 2007, it would seek to sentence him as a PFO based on a previous federal felony conviction for possession of stolen mail. Dodson argues that the State failed to show that the late filing of the PFO notice was for "good cause" pursuant to § 46-13-104, MCA, and that his sentence should be reversed.

¶53 The State argues that the District Court's sentence should be affirmed under *State v. Shults*, 2006 MT 100, 332 Mont. 130, 136 P.3d 507. In *Shults*, we held as follows:

21

if a defendant had ample opportunity to object to PFO treatment, including the underlying charge on which the statute is based, and that defendant was not prejudiced by the timing of the filing, we will not overturn a district court's decision to impose a sentence with a PFO designation.

*Shults*, ¶ 22.

¶54 Dodson was sentenced on July 3, 2007. Since the amended PFO designation was filed on February 28, 2007, we conclude he had ample time to object to his treatment as a PFO. The District Court did not err in allowing the State to seek sentencing of Dodson as a PFO in this case.

## CONCLUSION

¶55 We affirm the District Court's denial of Dodson's motion to dismiss, as well as his motion to strike and motion to suppress. We further conclude the District Court did not err in allowing the State to seek to sentencing of Dodson as a PFO. Dodson's conviction is therefore affirmed.

/S/ JAMES C. NELSON

We concur:

/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JIM RICE