DA 11-0052

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 169

JAMES PATRICK,

      Petitioner and Appellant,

  v.

STATE OF MONTANA,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 10-1371
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          James Patrick, (self-represented litigant); Shelby, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General; Tammy K Plubell,
Assistant Attorney General, Helena, Montana

          Scott Twito, Yellowstone County Attorney, Rod Souza,
Deputy County Attorney, Billings, Montana

Submitted on Briefs:  June 15, 2011

Decided:  July 19, 2011

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     James Patrick appeals from an interlocutory order of the District Court, Thirteenth Judicial District, Yellowstone County, substituting the second District Court judge after the first recused herself from Patrick's postconviction proceedings. We affirm in part and reverse in part.

## ISSUES

¶2     We restate Patrick's issues on appeal:

¶3     1. Whether the District Court erred when it denied Patrick's motion to invalidate the State's judicial substitution after the sentencing judge recused herself from postconviction proceedings.

¶4     2. Whether the District Court erred when it denied Patrick's request for additional time to file a motion for judicial substitution.

## BACKGROUND

¶5     On August 9, 2010, Patrick filed a petition for postconviction relief.[1] On August 24, 2010, the Honorable Susan Watters, District Court Judge, who presided over Patrick's previous trial and sentencing, recused herself and ordered that Patrick's postconviction proceedings be reassigned. On August 24, 2010, Patrick's case was transferred to the Honorable Ingrid Gustafson, District Court Judge.

---

[1] This Court previously upheld Patrick's conviction in *State v. Patrick*, 2009 MT 220N, 214 P.3d 790 (Table).

2

¶6     On August 27, 2010, the Yellowstone County Attorney's Office filed a motion, pursuant to § 3-1-804, MCA, to substitute Judge Gustafson. The accompanying certificate of service affirmed that the motion was sent to Patrick at the Yellowstone County Detention Facility. However, Patrick had already been transferred to the regional prison in Shelby, Montana.

¶7     On August 27, the same day the State filed its motion to substitute, the Yellowstone County Clerk of Court filed a notice of substitution, transferring Patrick's postconviction proceedings to the Honorable Gregory Todd, District Court Judge. The Clerk of Court mailed notice to Patrick at his correct address in Shelby. Patrick received that notice.

¶8     On September 24, 2010, Patrick filed a motion to invalidate the substitution of Judge Gustafson. He asserted that judicial substitution by right is not allowed in postconviction proceedings, and he was improperly served. The State filed a response asserting that upon Judge Watters' recusal, substitution was permitted under § 3-1-804(1) and (8), MCA. On October 13, 2010, Judge Todd issued an order denying Patrick's motion. On October 15, 2010, two days after the District Court issued its order, Patrick filed a reply brief.

¶9     On November 1, 2010, Patrick filed a motion for relief from the District Court's October 13 order. Patrick asserted that the substitution of Judge Gustafson was invalid, he had not been properly served, and the October 13 order was void because he had not been permitted to file a reply brief. Patrick also raised a number of claims concerning equal protection, and due process. He requested that the substitution be invalidated and he be

3

absolved from his procedural duty to serve the State for the remainder of the postconviction action. Alternatively, he requested 30 days to file his own motion for judicial substitution.

¶10 On December 9, 2010, the District Court denied Patrick's motion. The District Court rejected Patrick's argument regarding his time to file a reply brief because under Uniform District Court Rule 2(a) reply briefs are discretionary. The District Court acknowledged that the State's motion to substitute had listed Patrick's wrong address but pointed out that Patrick had been mailed notice of the substitution on the same day the motion was filed and granted. The District Court concluded that to "accept the voiding of a substitution in this case is to exalt form over function." With regard to Patrick's equal protection and due process claims, the District Court concluded that they would be resolved during postconviction proceedings. Finally, the District Court denied Patrick's request for an additional 30 days to file a motion for judicial substitution, concluding that any motion was untimely.

STANDARDS OF REVIEW

¶11 A district court's interpretation and application of a statute is a conclusion of law that this Court reviews for correctness. *Kulstad v. Maniaci*, 2009 MT 403, ¶ 6, 353 Mont. 467, 221 P.3d 127.

¶12 "A district court's ruling on a motion to substitute a district court judge presents a question of law. We review a district court's conclusions of law to determine whether they are correct." *Eisenhart v. Puffer*, 2008 MT 58, ¶ 13, 341 Mont. 508, 178 P.3d 139.

DISCUSSION

4

¶13 *Whether the District Court erred when it denied Patrick's motion to invalidate the State's judicial substitution after the sentencing judge recused herself from postconviction proceedings.*

¶14 Patrick makes three arguments that the substitution of Judge Gustafson was invalid. First, he asserts that there is no right to judicial substitution in postconviction proceedings. Second, he asserts that the State never properly served the motion to substitute. Third, he argues that he was denied due process because the District Court issued its order before he had the opportunity to file a reply brief. We address each in turn.

*a. Judicial substitution in postconviction proceedings*

¶15 The general rule in Montana is that each adverse party in a civil action has a statutory right to one judicial substitution in district court. Section 3-1-804(1), MCA; *Swan v. State*, 2006 MT 39, ¶¶ 23-24, 331 Mont. 188, 130 P.3d 606. Postconviction proceedings are civil in nature. *Coleman v. State*, 194 Mont. 428, 433, 633 P.2d 624, 627 (1981). Section 3-1-804, MCA, provides only three circumstances where judicial substitution is not available: when a district court judge is (1) acting as a water court judge, (2) acting as a workers' compensation judge, or (3) supervising the distribution of water under § 85-2-406, MCA. Thus, read alone, § 3-1-804, MCA, permits judicial substitution in postconviction relief proceedings.

¶16 However, the interplay between postconviction relief statutes and Title 3, Chapter 1, section 8, results in a denial of the right to judicial substitution in postconviction proceedings. *Coleman*, 194 Mont. at 433-34, 633 P.2d at 627-28; *State v. Harris*, 2003 MT

5

258, ¶¶ 17-18, 317 Mont. 406, 77 P.3d 272.  A petition for postconviction relief must be filed in "the court that imposed the sentence."  Section 46-21-101(1), MCA.  In *Coleman*, this Court interpreted "the court that imposed the sentence" to require that postconviction proceedings occur in front of the same judge who presided over sentencing.  *Coleman*, 194 Mont. at 434, 633 P.2d at 628.  A number of policy reasons underlie such a conclusion:

1. Reduction of burden on the District Court at the place of confinement;
2. Reduction of costs as most hearing participants are likely to live near the trial court;
3. The convicting court possesses greater familiarity with the facts and circumstances; and
4. The goal of postconviction proceedings is to give the court that made the initial determinations a chance to correct any mistakes.

*Id*.  Additionally, the Court inferred that the Legislature had intended for the sentencing judge to preside over subsequent postconviction proceedings.  *Coleman*, 194 Mont. at 435, 633 P.3d at 628.  Thus, the Court concluded that the specificity of § 46-21-101(1), MCA, took precedence over the general statutory right to judicial substitution.  *Coleman*, 194 Mont. at 433, 633 P.3d at 627; § 1-2-102, MCA.

¶17　The State agrees that the policies that govern the filing of postconviction petitions are sound, but argues that § 46-21-101(1), MCA, does not address the rare circumstance where the sentencing judge recuses herself from the postconviction proceedings.  The State asserts that in such a case, § 3-1-804(8), MCA, should apply:

> If the presiding judge in any action recuses himself or herself or if a new district judge assumes jurisdiction in any action, the right to move for substitution of a district judge is reinstated, except as to parties who have previously obtained a substitution. The time periods run anew from the date of service of notice or other document identifying the new district judge.

Before turning to the resolution of this issue, we take this opportunity to recount the history of Montana's judicial substitution statute. The events surrounding the passage of the statute have been described as "one of the bitterest conflicts of its kind ever waged in the United States." *Helen Fitzpatrick Sanders, A History of Montana* vol. 1, 420 (The Lewis Pub. Co. 1913).

¶18     The story begins in 1889, in Butte, Montana, with the arrival of a young surveyor named F. Augustus Heinze. Though an ambitious man, Heinze had neither the wealth of W. A. Clark or Marcus Daly,[2] nor their political connections. K. Ross Toole, *Montana: An Uncommon Land* 197-98 (U. Okla. Press 1959). However, what Heinze lacked in resources he made up for in a keen understanding of the law governing the ownership of ores within the earth. *Id.* Prior to Heinze's arrival, the Silver Bow County Courts had avoided litigation regarding ownership of the ores beneath the richest hill on earth; Heinze singularly changed that. Sanders, *A History of Montana* vol. 1, 421.

---

[2] Daly, an uneducated Irish immigrant, arrived in Butte in 1876. Over the next 24 years, he built an empire of copper mining that ultimately became the Anaconda Copper Mining Company. Sanders, *A History of Montana* vol. 1, 414-15, n. 9. Clark, arrived in the wilderness of Montana in 1863, encumbered by his pack and three books, one legal, one geological and one poetical. By 1900, Clark owned 13 mines in Butte and had others in Idaho and Arizona, owned the *Butte Miner* newspaper, and was president of the Rocky Mountain Telegraph Company. Toole, *Montana: An Uncommon Land*, 174-76. From 1888 to 1900, Montana's State affairs were inextricably intertwined with personal feuds of the two men. Notably, Clark and Daly battled over the location of Montana's State Capital, and Clark's unyielding efforts to attain, and maintain, a United States Senate seat. *Id.* at 179, 182, 189-94, 214 illus.

¶19    Armed with his favorite legal weapon, the injunction, Heinze commenced filing lawsuits, asserting that various ore bodies reached an apex on his claims. *Id.* at 423. Generally, under the apex theory, or rule of extra-lateral rights, if an ore vein apexed on a claim, that claim's owner could chase the vein below ground, without regard to the claim's above-ground confines. *Id*. at 422. Heinze was not ashamed to purchase a tiny un-owned swath of land and immediately assert that ore being mined on a neighboring claim actually apexed on his. *Id.* at 423. Although such conduct might not ultimately prove legally successful, Heinze's cases had a habit of remaining tied up in the courts for years. Toole, *Montana: An Uncommon Land* 198-99. Heinze filed over 100 lawsuits, and between 1901 and 1902 he was involved in 14 separate actions before the Montana Supreme Court. *Id.* at 201. Furthermore, these lawsuits were not cheap. Heinze was known to have 37 lawyers on staff, and forced his opponents to spend millions on legal fees and associated costs. C. B. Glasscock, *The War of the Copper Kings* 273 (Grosset & Dunlap, 1966); Toole, *Montana: An Uncommon Land* 201-02. Moreover, while legal action was pending, Heinze was not above sending his workers into the earth to mine the contested ore, using the proceeds to maintain his expensive legal bills. Toole, *Montana: An Uncommon Land* 198-99.

¶20    However, injunctions alone could not make Heinze rich. Rather, his true power has historically been perceived to have resided in the form of two men: District Court Judges William Clancy and E. W. Harney. Clancy was something of a judge-of-the people, popular with the bartenders, miners and "the lower level of Butte society." C. B. Glasscock, *The War of the Copper Kings* 157. A "burlesque of judicial dignity, William Clancy found in

8

Heinze's favor with monotonous regularity." Toole, *Montana: An Uncommon Land* 199. In one notable case, Clancy determined that three valuable ore veins, the Anaconda, St. Lawrence and Neversweat, apexed in a 75-foot-long triangular sliver of land owned by Heinze. Sanders, *A History of Montana* vol. 1, 423. Harney, for his part, handed down one of Heinze's greatest victories, ownership of the disputed Minnie Healy Mine, amidst allegations of bribery, and revelation of a clandestine relationship with a public stenographer with ties to Heinze. *Id*. at 424.[3]

¶21 Historians disagree over whether Judges Harney and Clancy were corrupt, inept, or merely fiercely loyal to Heinze. *See,* Toole, *Montana: An Uncommon Land* 201, 204-05 (condemning the "egg-bespattered Clancy" but noting the potential that Harney was not corrupt); Sanders, *A History of Montana* vol. 1, 421-25 (declining to cast aspersions on either jurist); Glasscock, *The War of the Copper Kings* 156 (noting that Clancy often took direct opposition to Heinze's interests); Malone & Roeder, *Montana: A History of Two Centuries* 172 (indicating that Clancy "gained fame for his unfailing support of Heinze" but noting that rumors of bribery were never proved). However, regardless of their motives, continual rulings in Heinze's favor invited the antipathy of the Amalgamated Copper Company. By that time a bloated leviathan of a world-wide mining entity, Amalgamated grew increasingly frustrated with its inability to crack Heinze's hold upon the Silver-Bow judiciary. Toole,

---

[3] For a discussion of Judge Clancy's role in the development of Montana's writ of supervisory control *see* Larry Howell, "*Purely the Creature of the Inventive Genius of the Court": State ex rel., Whiteside and the Creation and Evolution of the Montana Supreme Court's Unique and Controversial Writ of Supervisory Control*, 69 Mont. L. Rev. 1 (2008).

*Montana: An Uncommon Land* 202. When legal action failed, Amalgamated resorted to bribery, offering Harney $250,000 to sign an affidavit that Heinze had purchased his loyalty.[4] Sanders, *A History of Montana* vol. 1, 425. Even when Amalgamated succeeded in removing Judge Harney from the lawsuit concerning ownership of the Minnie Healy Mine and obtained a new trial, the case was remanded to Judge Clancy, who subsequently ruled in Heinze's favor. *Finlen v. Heinze*, 28 Mont. 548, 73 P. 123 (1903); *Finlen v. Heinze*, 32 Mont. 354, 80 P. 918 (1905).

¶22 Amalgamated realized that "recourse" to the law was both costly and unsuccessful and opted for a new approach: "extortion." Toole, *Montana: An Uncommon Land* 206. On October 3, 1903, Amalgamated announced a shutdown of all Montana operations, except for the company's newspapers, casting an estimated four-fifths of Montana wage earners into unemployment. *Id*. at 206-07. Amalgamated's demand was simple: the Governor was to call an extraordinary session of the Montana Legislature in order to enact legislation that would put an end to the troublesome Heinze litigation. Sanders, *A History of Montana* vol. 1, 425; Toole, *Montana: An Uncommon Land* 208. On November 10, Governor Toole, "yielding to the exigency of the hour," called a special session. Laws of Montana 1903, Second Extraordinary Session, p. 7. In response, the Legislature passed the "Fair Trial Bill," and Amalgamated resumed work throughout Montana. Sanders, *A History of Montana* vol. 1, 425. The new law permitted a party to automatically obtain judicial substitution by filing

---

[4] The lawyers involved were subsequently acquitted. During the proceedings, the attempted bribe was construed as merely an offer to pay for evidence. Toole, *Montana: An*

10

an affidavit upon the belief that a fair and impartial hearing or trial was not possible before the presiding judge. Laws of Montana 1903, Second Extraordinary Session, Ch. 3, § 1(4). By the next year, Judges Clancy and Harney were voted from the bench. Sanders, *A History of Montana* vol. 1, 425.

¶23 Ultimately, Heinze resists being cabined as angel or villain. Describing the moral conundrum he posed, a contemporaneous magazine explained, "[h]is course has been without moral justification, but not wholly without excuse. Indeed, the most depressing feature of the conflict to an unprejudiced onlooker is the fact that had he been a more scrupulous man, he would long since have been wiped off the slate." Toole, *Montana: An Uncommon Land* 203. In 1906, Amalgamated did finally erase Heinze. The company purchased his mining interests and secured the dismissal of eighty pending lawsuits. Four years later, he died penniless in New York City. *Id.* at 209. Despite this ultimate defeat, Augustus Heinze's short but successful vexation of the all-powerful Amalgamated provided the impetus for a judicial substitution statute that remains in effect over one century later.[5]

¶24 Returning to the case at hand, we conclude that when a sentencing judge recuses herself from postconviction proceedings, the parties may move for judicial substitution

---

*Uncommon Land* 205.

[5] The "Fair Trial Bill" was subsequently codified in R.C.M. 1947, § 93-901. R.C.M. 1947, § 93-901 was superseded by order of this Court and codified as § 3-1-801, MCA. *In re Rules of the Supreme Court*, 34 State Rep. 26, 27 (1976). Section 3-1-801, MCA, was subsequently superseded by order of this Court and codified in § 3-1-802, MCA. *In re Rules of the Supreme Court*, 194 Mont. 8, 10-11 (1981). Finally, § 3-1-802, MCA, was superseded by order of this Court, and the right to judicial substitution was codified in § 3-1-804, MCA,

11

pursuant to § 3-1-804, MCA. As explained above, § 46-21-101(1), MCA, takes precedence over § 3-1-804, MCA, because the specific policies that favor having the sentencing judge preside over postconviction proceedings conflict with the general statutory right of judicial substitution. However, once a petition is properly filed in "the court that imposed the sentence" and the sentencing judge recuses herself, the policies articulated in *Coleman* are absent.

¶25 Any judge who assumes jurisdiction over a postconviction proceeding after recusal of the sentencing judge possesses no greater knowledge of the facts and circumstances than any other judge who might subsequently assume jurisdiction. Likewise, the goal of providing the sentencing judge with an opportunity to correct prior mistakes is obviated once the sentencing judge has ceased to preside over the action. In short, when Judge Watters recused herself from the postconviction proceedings, § 46-21-101, MCA, ceased to conflict with § 3-1-804, MCA, and no longer took precedence over the long-held right in Montana to a judicial substitution. The District Court did not err when it concluded that § 3-1-804(8), MCA, applied, and the "right to move for substitution of a district judge [was] reinstated."

### b. Service of the motion to substitute Judge Gustafson

¶26 Patrick next argues that the incorrect address on the State's motion to substitute, resulted in improper service, and the resulting judicial substitution was invalid. The State argues that the notice sent by the Yellowstone County Clerk of Court was sufficient to give

---

where it continues to reside today. *In the Matter of the Rules on the Disqualification and Substitution of Judges*, 227 Mont. 31, 31-33 (1987).

Patrick actual notice that Judge Gustafson had been substituted. We agree with the District Court that Patrick's argument exalts "form over function." Section 1-3-219, MCA.

¶27 The Clerk of Court sent Patrick notice of Judge Gustafson's substitution on the same day that the State filed its motion. Section 3-1-804(2)(b), MCA, requires that "the moving party shall serve copies of the motion for substitution upon all other parties to the proceeding." However, judicial substitution occurs automatically upon the filing of a timely motion, precluding any objection until after the substitution has already occurred. Section 3-1-804(5), MCA ("After a timely motion has been filed, the substituted district judge does not have power to act on the merits of the case or to decide legal issues in the case, except as provided in subsection (10)."). As a result, any notice sent pursuant to § 3-1-804(2)(b), MCA, will inevitably be received subsequent to the substitution. Thus, the practical function of requiring service is to provide the other parties with actual notice that a party has exercised the statutory right of judicial substitution. Here, Patrick received such notice when the Clerk of Court sent notice of the substitution to Patrick's correct address.

¶28 Moreover, Patrick's actual notice of the substitution provided him ample opportunity to be heard. As the record reflects, he filed an objection and briefed the issue. When the District Court ruled against him, Patrick asked the District Court to reconsider, and the District Court again addressed Patrick's contentions.

*c. Reply brief*

¶29 Patrick fails to demonstrate that he was denied due process because the District Court issued its order on October 13, 2010, without waiting for his reply brief. Patrick

13

subsequently filed a second motion requesting that the District Court reconsider the October 13 order. In its December 8, 2010 order, the District Court concluded, "this Court has reviewed all of the arguments of Patrick in his reply brief as well as his motion and brief for relief from order and to quash. All of Patrick's arguments are either repetitive or unpersuasive." Thus, Patrick had the opportunity to present all of his contentions to the District Court, and the District Court considered and rejected them.

¶30    *Whether the District Court erred when it denied Patrick's request for additional time to file his own motion for judicial substitution.*

¶31    A party to a civil action must file a motion for substitution "within 30 calendar days after the first summons is served or an adverse party has appeared. A motion for substitution by the party served must be filed within 30 calendar days after service has been completed in compliance with M. R. Civ. P. 4." Section 8-1-804(1)(a), MCA. Patrick did not make a timely request for judicial substitution within 30 days of serving the State with his petition. Rather, he challenged the State's ability to move for a judicial substitution. Even after the District Court upheld the validity of the State's motion, Patrick still did not request a judicial substitution. Instead he requested a 30-day extension to file his own motion.

¶32    However, we recognize that the legal interplay between §§ 3-1-804 and 46-21-101, MCA, was unsettled at the time Patrick objected to the substitution of Judge Gustafson. It would be inequitable to fault Patrick for failing to request a judicial substitution on September 24, 2010, when he filed an objection based upon the non-frivolous belief that the substitution was invalid. By the time the District Court issued its October 13, 2010 order

14

upholding the substitution, Patrick's 30-day window to file a motion had passed. Patrick should have been given the opportunity to file his own motion for judicial substitution. In these specific circumstances, equity dictates that Patrick be given 20 days to move for a judicial substitution, to run from the date of remittitur.

¶33 Finally, Patrick raises a number of claims that he has been the victim of ongoing due process and equal protection violations at the hands of the Thirteenth Judicial District Court. Rule 12(1)(f) of the Montana Rules of Appellate Procedure requires that an Appellant's argument "contain the contentions of the appellant with respect to the issue presented, and the reasons therefor, with citations to authorities, statutes and pages of the record relied on." Patrick provides a page-and-a-half of conclusory allegations with no citations to any record or authority. This argument fails to comply with M. R. App. P. 12(1)(f) and we will not address it on appeal. *State v. Dodson*, 2009 MT 419, ¶ 26, 354 Mont. 28, 221 P.3d 687.

¶34 We affirm in part, reverse in part, and remand for further proceedings.


/S/ MIKE McGRATH


We concur:

/S/ BRIAN MORRIS
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JIM RICE


15