No. 98-260

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 169

295 Mont. 183

983 P.2d 377

STATE OF MONTANA,

Plaintiff and Respondent,

v.

JOE E. GORDON,

Defendant and Appellant.

APPEAL FROM: District Court of the Fifth Judicial District,

In and for the County of Jefferson,

The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Herman A. Watson, III and Anne H. Watson; Watson Law Office,

Bozeman, Montana

Patricia L. Day-Moore, Attorney at Law, Whitehall, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General,

Tammy K. Plubell, Assistant Attorney General, Helena, Montana

Valerie D. Wilson, Jefferson County Attorney,

Mark Mattioli, Deputy County Attorney, Boulder, Montana

Submitted on Briefs: April 15, 1999

Decided: July 15, 1999

Filed:

_____

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

**¶1. Joe E. Gordon (Gordon) appeals from the judgment and sentence entered by the Fifth Judicial District Court, Jefferson County, on his plea of guilty to the felony charge of aggravated kidnapping. We affirm.**

**¶2. Gordon presents the following issues:**

**¶3. 1. Were Gordon's constitutional rights violated by the District Court's failure to sentence Gordon pursuant to a cooperation agreement?**

**¶4. 2. Did the District Court err in sentencing Gordon?**

## FACTUAL AND PROCEDURAL BACKGROUND

**¶5. On February 7, 1996, the mother of Michael Fox (Fox) reported to the Bonneville County, Idaho, Sheriff's Office (BCSO) that her son had been missing for several days. She provided a description of the clothing worn by Fox when last seen, as well as a description and license number of his vehicle. The BCSO placed an "attempt to locate" Fox and the vehicle owned and driven by him into the national law**

enforcement computer system.

¶6. On February 9, 1996, a Montana Highway Patrol officer stopped a vehicle occupied by Gordon and Burly Grimes (Grimes) in Billings, Montana. Based on information obtained from running the vehicle's license number through the law enforcement computer system, the officer determined that the vehicle was registered to Fox, who was listed as missing. Gordon and Grimes were placed in custody and Gordon told law enforcement authorities a story he and Grimes previously had rehearsed about why they were in possession of Fox's vehicle.

¶7. Idaho law enforcement personnel subsequently assumed custody of Gordon and Grimes, returned them to Idaho, and charged them with grand theft for stealing Fox's vehicle. By that time, Idaho authorities were investigating Fox's disappearance as a homicide and the Bonneville County prosecutor, David Johnson (Johnson), decided to seek the cooperation of either Gordon or Grimes. To that end, Johnson contacted Gordon's public defender.

¶8. On April 2, 1996, Johnson entered into a Cooperation Agreement (First Agreement) with Gordon on behalf of the Bonneville County Prosecuting Attorney's Office and its investigative agencies (hereinafter, collectively, Idaho). Gordon agreed to provide "complete and detailed information concerning the names and roles of all persons known or suspected by him to be involved in the homicide of Michael Fox during the month of February, 1996[;]" the information was to be the "whole truth and nothing but the truth. . . ." An initial interview date was set, at which time Gordon was "obligated only to provide information leading to the whereabouts of the alleged victim[.]" Gordon was to provide all other information needed by Idaho to successfully investigate the criminal activities at issue during a subsequent interview, and Gordon agreed to appear at any hearings or trials required by Idaho. In exchange for Gordon's promises, Idaho agreed to enter into and continue negotiations with Gordon "with the good faith intention of providing an acceptable plea agreement to defendant and his attorney, whether it be a reduction in charges, a sentencing agreement, or both." Idaho reserved the right to void the First Agreement if Gordon failed to comply with its terms, including "complete truthfulness as to all matters."

¶9. During the initial interview with Idaho authorities under the First Agreement, Gordon disclosed that Fox's body was somewhere in Mulligan Canyon in Montana.

He stated that he did not know the precise location of the body because he was not present when the murder occurred. Fox's body subsequently was located in Mulligan Canyon, in Jefferson County, Montana, at the end of a two-day search. Johnson later determined that Gordon had not been completely truthful in the interview. After Fox's body was found, Johnson made a courtesy telephone call to the Jefferson County Attorney to advise that Fox's body had been located in that county. He continued negotiations with Gordon.

¶10. On May 6, 1996, Johnson entered into a Cooperation and Settlement Agreement (Second Agreement) with Gordon which again focused on Gordon's truthfulness. Gordon was required to provide Idaho with complete and detailed information relating to Idaho's investigation of physical injuries to, and the confinement and death of, Fox. In addition, Gordon agreed to submit to a polygraph examination relating to Fox's "kidnaping, attack, and/or homicide" on request. Finally, Gordon agreed to plead guilty to the offense of grand theft already charged by Idaho at that time; to second degree kidnapping, if such a charge were filed; and to accessory to first degree murder if it turned out that Gordon was physically present when Fox's body was removed from the trunk of his vehicle and if Gordon assisted in the criminal venture at that point in any way. Gordon was free to argue for any sentence he deemed appropriate.

¶11. In exchange for Gordon's promises, Idaho agreed in the Second Agreement to recommend that the fixed portion of any prison sentence imposed on Gordon not exceed 10 years on all charges. In addition, Idaho agreed to file no charges against Gordon in connection with Fox's death which were not referenced in the Second Agreement, to inform Gordon's family and certain Montana law enforcement authorities of dangers to Gordon's family that could arise because of his cooperation, and to notify Gordon and his family if Grimes were released from custody. As with the First Agreement, Idaho retained the ability to void the Second Agreement if Gordon violated any of its terms and, in that event, to file or refile any charges it could prove against him. Finally, Idaho agreed to "make a good faith effort to have the defendant serve any time to which he may be sentenced from this incident in Montana." If that could not be accomplished, Idaho would attempt to have Gordon serve his time in some state other than Idaho and in a state where neither Grimes nor a member of his immediate family was serving time.

¶12. Idaho's investigation continued for several months and Gordon took the

polygraph examination required by the Second Agreement. After reviewing the polygraph results, other evidence, and inconsistent statements by Gordon, Johnson determined that Gordon had violated the Second Agreement by being untruthful. Idaho subsequently charged Gordon with murder, first degree kidnapping and robbery.

¶13. Thereafter, on motion by Grimes supported by Gordon's counsel, an Idaho magistrate determined that Montana had jurisdiction based on evidence that Fox's death occurred there rather than in Idaho. The State of Montana (State) subsequently charged Gordon and Grimes with the aggravated kidnapping, robbery, and deliberate homicide of Fox, and filed a notice of intent to seek the death penalty against both defendants.

¶14. Gordon and Grimes both pleaded not guilty to the charges and their cases were severed. Grimes proceeded to trial and a jury found him guilty of all three charges. The court sentenced Grimes to concurrent terms of 80, 40, and 80 years in the Montana State Prison (MSP), and ordered him ineligible for parole for 25 years. We affirmed Grimes' conviction in State v. Grimes, 1999 MT 145, ¶ 51, ___ P.2d ___, ¶ 51, 56 St.Rep. 566, ¶ 51.

¶15. Gordon's case proceeded separately and, on February 3, 1997, Gordon moved the District Court to enforce the Second Agreement between himself and Idaho and require the State to be bound by it. The State opposed the motion, arguing that Idaho could not bind it to a pretrial agreement in which it had not participated. The State also contended that Idaho previously had determined the Second Agreement to be void because of Gordon's failure to comply and, as a result, no Second Agreement existed by the time Montana assumed jurisdiction of the case. The District Court held a hearing on Gordon's motion and subsequently denied it.

¶16. Several days before the scheduled trial date in July of 1997, Gordon and the State entered into a plea agreement. Gordon agreed to plead guilty to aggravated kidnapping and, in exchange, the State agreed to dismiss the robbery and deliberate homicide charges and withdraw its notice of intent to seek the death penalty. The State also agreed to recommend an 80-year prison sentence. The plea agreement stated that "[t]he parties represent that there have [sic] been no other consideration promised."

¶17. On the date previously scheduled for trial, Gordon appeared before the District Court to change his plea pursuant to the plea agreement. The court inquired about his understanding of the agreement and explained that it was not bound by the State's sentencing recommendation, but could impose the maximum sentence of life imprisonment without eligibility for parole. The court also obtained Gordon's understanding of the rights he would give up by pleading guilty and specifically informed Gordon that he was giving up any appeal rights he might have. Gordon acknowledged that he was giving up his right to an appeal. The District Court accepted Gordon's guilty plea to the offense of aggravated kidnapping and dismissed the other charges.

¶18. Gordon's sentencing hearing occurred on October 24, 1997. Both parties presented witnesses and exhibits and made sentencing recommendations. The State informed the court that it had taken Gordon's cooperation with authorities into account in entering into the plea agreement and agreeing to dismiss the robbery and deliberate homicide charges and recommend the 80-year prison sentence. Gordon's counsel observed that the court had determined it could not force the State to abide by the Second Agreement entered into between Gordon and Idaho. He requested that the court "seriously consider" the Second Agreement in sentencing Gordon or, alternatively, that the court impose a 40-year prison sentence, with 20 years suspended. According to defense counsel's calculations, the effect of the latter sentence would be that Gordon would spend 10 years in prison before becoming eligible for parole.

¶19. Prior to the oral pronouncement of sentence, the District Court reviewed the statutory factors it was to consider in sentencing and discussed at some length the evidence relating to the statutory factors. With regard to the nature of the offense, the court stated:

This crime is one of the most horrendous crimes that I have ever been connected with. It involves the brutalization and kidnapping of an innocent person who intended no harm to Mr. Gordon or to Mr. Grimes. It involved his being held against his will, confined in his own vehicle as it was brought to Montana. And it involves his being placed in the trunk in subzero weather and held over night, I think, for 16 hours; and then to discover in the morning that he was still alive and then his eventual killing at the hands of Grimes or Gordon or both.

It concluded that because of the seriousness of the crime, Gordon's criminal history and the absence of any likelihood that Gordon would ever be rehabilitated, no alternatives to prison existed. The District Court then sentenced Gordon to 80 years in the MSP and, based on its assessment that Grimes may have been the leader in the criminal venture and had a much worse criminal record than Gordon, did not limit Gordon's parole eligibility. Judgment was entered accordingly and Gordon appeals.

## DISCUSSION

**¶20. 1. Were Gordon's constitutional rights violated by the District Court's failure to sentence Gordon pursuant to the Second Agreement?**

**¶21. Briefly stated, Gordon contends he was entitled to be sentenced in accordance with the Second Agreement entered into with Idaho under constitutional principles relating to the enforcement of plea bargain agreements. Relying on a number of cases from the United States Supreme Court and this Court, he contends his rights to due process and to remain silent--protected by both the United States Constitution and the Montana Constitution--were violated by the failure of the Jefferson County Attorney to comply with the sentencing recommendation set forth in the Second Agreement and by the refusal of the District Court to sentence him in accordance with the Second Agreement.**

**¶22. In response, the State asserts that Gordon is attempting to appeal from the District Court's denial of his motion to enforce the Second Agreement and that he waived the right to do so by entering a guilty plea without reserving the right to appeal the court's pre-plea determination. Observing that Gordon is not attempting to withdraw his guilty plea, the State maintains that the entry of a guilty plea voluntarily and understandingly made waives all nonjurisdictional defects and defenses, including claims of constitutional violations occurring prior to the plea. We agree.**

**¶23. After the defendant in a criminal case pleads guilty, thereby admitting he or she is guilty of the offense charged, the defendant may only attack the voluntary and intelligent character of the guilty plea and may not raise independent claims relating to prior deprivations of constitutional rights. State v. Wheeler (1997), 285 Mont. 400,**

402, 948 P.2d 698, 699 (citation omitted). A voluntary and intelligent guilty plea constitutes a waiver of nonjurisdictional defects and defenses. *Wheeler*, 285 Mont. at 402, 948 P.2d at 699 (citation omitted).

¶24. In this case, Gordon has neither challenged the voluntary and intelligent nature of his plea nor sought to withdraw the guilty plea entered under his plea agreement with the State. Thus, by pleading guilty, he waived all nonjurisdictional claims for purposes of appellate review.

¶25. In Hagan v. State (1994), 265 Mont. 31, 36, 873 P.2d 1385, 1388, this Court adopted the description of "jurisdictional claims" in the context of waiver set forth in United States v. Cortez (9th Cir. 1992), 973 F.2d 764. There, the Ninth Circuit limited jurisdictional claims to those cases in which the district court could determine, at the time of accepting the guilty plea and from the face of the indictment or from the record, that the government lacked the power to bring the indictment. *Cortez*, 973 F.2d at 767 (citation omitted).

¶26. Nothing of record in the present case indicates that, when the District Court accepted Gordon's guilty plea to aggravated kidnapping in exchange for dismissal of the charges of robbery and deliberate homicide, the State did not have the power to bring the charges stated in the information against Gordon. Nor does Gordon argue otherwise.

¶27. Gordon contends, however, that both the United States Constitution and the Montana Constitution "demand that all constitutional protections are not abandoned by an appellant at the time he enters a guilty plea." He argues that constitutional protections "should follow an appellant through the entire sentencing process" and cites to cases which purportedly support his argument. While the cases on which Gordon relies contain general statements about a defendant's ability to appeal an illegal sentence, they are distinguishable on their facts and, therefore, not applicable here. As a result, we discuss them only briefly.

¶28. Both Ayers v. State (Wyo. 1997), 949 P.2d 469, 470, and Bird v. State (Wyo. 1997), 939 P.2d 735, 736, involved defendants attempting to withdraw guilty pleas and seeking to raise pre-plea constitutional defects. That is not the situation before us in the present case. Therefore, *Wheeler's* holding that a guilty plea waives all nonjurisdictional defects and defenses, including alleged constitutional violations

occurring before the plea, remains applicable here. *See Wheeler*, 285 Mont. at 402, 948 P.2d at 699.

¶29. Moreover, State v. White (Ariz. App. 1989), 773 P.2d 482, 484, State v. Phillips (Ariz. App. 1983), 678 P.2d 512, 514, and People v. Drummond (N.Y. 1976), 359 N. E.2d 663, 664, *cert. denied*, 431 U.S. 908 (1977), involved routine contentions on appeal that the sentences imposed after plea agreements and entry of guilty pleas were illegal and did not involve arguments on appeal that pre-plea rulings violated the law or the constitution. Under similar circumstances, Montana case law also permits appeals from illegal sentences. *See, e.g.,* State v. Romannose (1997), 281 Mont. 84, 94, 931 P.2d 1304, 1311; State v. Graves (1995), 272 Mont. 451, 463, 901 P.2d 549, 557. As to this issue, however, Gordon's case does not fall within those routine circumstances. Here, Gordon sought a ruling on his motion to require enforcement of the Second Agreement before he entered into a plea agreement with the State, and the District Court denied his motion. Thereafter, Gordon and the State entered into a plea agreement pursuant to which Gordon pleaded guilty to aggravated kidnapping and the State agreed to drop other charges and make a specific sentencing recommendation. Under such circumstances, Gordon's entry of the guilty plea waived his right to raise constitutional issues relating to the court's pre-plea refusal to enforce the Second Agreement. *See Wheeler*, 285 Mont. at 402, 948 P.2d at 699.

¶30. Gordon had two--and possibly three--alternatives after the District Court denied his motion to enforce the Second Agreement. First, he could maintain his innocence, proceed to trial and put the State to its proof. In the event he was convicted after choosing this option, Gordon could appeal from the court's denial of his motion as part of an appeal from the judgment and sentence. Second, he could enter into a negotiated plea agreement with the State, part of which would entail the entry of a guilty plea in exchange for certain benefits from the State, knowing that doing so also would entail the waiver of his right to appeal pre-plea rulings. This is the option Gordon chose.

¶31. A third alternative also may have been available to Gordon. Section 46-12-204 (3), MCA, permits a defendant--with the approval of the court and consent of the prosecutor--to "enter a plea of guilty, reserving the right, on appeal from the judgment, to review the adverse determination of any specified pretrial motion." Had this alternative been followed, Gordon could have entered into a plea agreement

with the State which required him to enter a guilty plea but expressly allowed him to appeal from the District Court's earlier denial of his motion to enforce the Second Agreement. This reservation of rights option is used with frequency in Montana to avoid the otherwise applicable *Wheeler* waiver consequences of entering a guilty plea. *See, e.g.*, State v. Pratt (1997), 286 Mont. 156, 951 P.2d 37; State v. Nye (1997), 283 Mont. 505, 943 P.2d 96; State v. Foshee (1997), 282 Mont. 326, 938 P.2d 601.

¶32. Gordon asserts, however, that he did not have the option of proceeding under § 46-12-204(3), MCA, because the State did not offer it to him and "[h]e had no control over the matter." While it may be true that the State did not offer to proceed under § 46-12-204(3), MCA, it does not necessarily follow that Gordon had no control over the matter. He apparently did not attempt to negotiate the statutory reservation of the right to appeal the District Court's denial of his motion into his plea agreement with the State. Having failed to seek the State's consent to reserve that right, Gordon's statement that he "had no choice because the Montana statute on conditional pleas is dependent upon the consent of the State[,]" rings hollow.

¶33. In this regard, Gordon cites to United States v. Warden of Attica State Prison (2nd Cir. 1967), 381 F.2d 209, 214, for the proposition that, even under a New York statute giving the defendant the opportunity to enter a guilty plea and still appeal an adverse pretrial motion, the Second Circuit held that the defendant's guilty plea could not be viewed as an intentional relinquishment or abandonment of his earlier Fourth Amendment claims. That case is inapposite for several reasons.

¶34. First, the basic underpinning of the cited case was a New York statute creating a specific exception to the general rule that a voluntary guilty plea waives all nonjurisdictional defects in any prior stage of the criminal proceeding. Pursuant to the New York statute, a pre-plea denial of a motion to suppress evidence purportedly seized in violation of constitutional search and seizure rights " 'may be reviewed on appeal from a judgment of conviction notwithstanding the fact that such judgment of conviction is predicated upon a plea of guilty.' " *Warden of Attica State Prison*, 381 F.2d at 214 (citation omitted). Montana has no such statute and, therefore, the Second Circuit case is distinguishable from the case presently before us.

¶35. More importantly, the threshold issue before the Second Circuit was

whether a defendant who enters a guilty plea in a New York State court, knowing that he

may subsequently challenge in the state's appellate process the denial of his pretrial motion to suppress evidence alleged to be the fruit of an illegal search and seizure, should be considered to have waived the right to raise his Fourth Amendment claims *in the federal courts by way of an application for habeas corpus. . . .*

*Warden of Attica State Prison*, 381 F.2d at 210-11 (emphasis added). *Thus, the case on which Gordon relies is a federal habeas corpus case and the Second Circuit's discussion of the threshold issue was set in that context. The present case is a direct appeal from a state court conviction; therefore, the Second Circuit's discussion and resolution of the issue before it in the context of federal habeas corpus law has no application here. Gordon remains free, of course, to advance his argument based on Warden of Attica State Prison in any future federal habeas corpus proceedings following the exhaustion of state remedies. See, e.g., Kills on Top v. State (1995), 273 Mont. 32, 59, 901 P.2d 1368, 1386.*

**¶36. We conclude that Gordon waived his right to appeal from the District Court's refusal to sentence him in accordance with the Second Agreement. As a result, we do not reach his argument that his constitutional rights were violated by the court's failure to do so.**

**¶37. 2. Did the District Court err in sentencing Gordon?**

**¶38. As set forth above, both parties presented witnesses and exhibits during Gordon's sentencing hearing. The probation and parole officer who prepared the presentence investigation testified about Gordon's criminal history and noted Gordon's alleged fear of Grimes, but referred to Dr. William Stratford's report indicating that Gordon was "fearless, aggressive, impulsive, ruthless, victimizing and dominating." He recommended an 80-year prison sentence without eligibility for parole due to Gordon being a threat to society and past failures on parole and supervision.**

**¶39. Gordon presented several witnesses, most notably Dr. Susan Sachsenmaier. Dr. Sachsenmaier testified at length regarding the flaws she perceived in Dr. Stratford's evaluation of Gordon and opined that Gordon's dependent personality disorder, post-traumatic stress disorder and other factors "combine to essentially rob [Gordon] of autonomous behavior." It also was Dr. Sachsenmaier's opinion that Gordon's acts vis-a-vis the kidnapping were done "out of his dependency and his fear."**

¶40. After the witnesses had completed their testimony, the State made its recommendation, pursuant to the plea agreement, that Gordon be sentenced to 80 years in the MSP, and specifically observed that it had taken his cooperation with officials into consideration in entering into the plea agreement. Gordon's counsel reviewed the mitigating evidence he had offered and observed that "[w]e don't know to what extent Joe Gordon was legitimately fearful of Burly Grimes." He recommended a 40-year sentence, with 20 years suspended, which would result in Gordon being eligible for parole in 10 years.

¶41. The District Court orally reviewed Montana's correctional policy and its sentencing obligations thereunder and then discussed the evidence before it at some length insofar as that evidence related to a proper sentence for Gordon. Ultimately, the District Court sentenced Gordon to the 80-year term of imprisonment recommended by the State pursuant to its plea agreement with Gordon and, based on its assessment that Grimes likely was the leader in the overall venture and had a worse criminal history than Gordon, did not limit his eligibility for parole.

¶42. Gordon asserts that the court committed numerous errors in sentencing him and we group the asserted errors into two categories: A.) failures to follow statutory requirements; and B.) imposition of an excessive sentence. After briefly reviewing Montana's sentencing laws, we address Gordon's arguments in turn.

¶43. Montana's correctional and sentencing policy is set forth at some length in § 46-18-101, MCA. That policy includes such considerations as punishing each offender commensurate with the nature and degree of harm caused by the offense and protecting the public by incarcerating violent offenders. *See* § 46-18-101(2)(a) and (b), MCA. In achieving the stated policy, courts must--among other things--consider aggravating and mitigating circumstances and punish violent and serious repeat felony offenders with incarceration. Section 46-18-101(3), MCA. The sentencing court also must "clearly state for the record the reasons for imposing the sentence." Section 46-18-102(3)(b), MCA.

¶44. In addition to the statutory correctional and sentencing policy, sentences authorized for specific offenses are statutory in Montana. With exceptions not at issue here, the available sentences for aggravated kidnapping--the offense for which Gordon was convicted--include the death penalty, life imprisonment, or imprisonment for not less than 2 or more than 100 years, and a fine of not more than

$50,000. *See* § 45-5-303(2), MCA. In this case, of course, the State withdrew its notice of intent to seek the death penalty pursuant to the plea agreement.

¶45. We review sentences for legality only. A sentence is legal if it falls within the range of sentences prescribed by the applicable statute or statutes. *Romannose*, 281 Mont. at 94, 931 P.2d at 1311 (citations omitted).

A. Failures to follow statutory requirements

¶46. Gordon asserts that the District Court sentenced him without adequate consideration of his minimal role in the crime as compared with that of Grimes, his fear of Grimes, and his crucial role in assisting law enforcement. On these bases, Gordon contends that the court failed to adequately consider mitigating factors as required by § 46-18-101(3)(d), MCA, and failed to ensure that the punishment fit his crime as required by § 46-18-101(2)(a), MCA. He also argues that the District Court failed to clearly state the reasons for the sentence as required by § 46-18-102(3)(b), MCA. We disagree.

¶47. With regard to Gordon's argument that his role in the aggravated kidnapping offense was relatively minimal, his handwritten notes in the plea agreement with the State as to the facts forming a basis for his guilty plea to that offense include the following:

I committed the offense of aggravated kidnapping by knowingly and purposely and without lawful authority restraining Mike Fox by secreting him in a place of isolation by using physical force. at [sic] that time, my purpose was to facilitate the felony of theft and flight. I also put Mike Fox in the trunk of the car at a time when I knew he could well be alive when I also knew that the below zero temperatures would cause him physical injury. The morning we left the Rocker Inn, I heard Mike Fox in the trunk and knew he was alive. I did not contact the authorities or aid in Mike Fox's rescue from Burley [sic] Grimes.

Gordon's own notes hardly reflect a "minimal role" in the aggravated kidnapping. In addition, the District Court observed that both Grimes and Gordon brutalized and kidnapped the innocent Fox, held him against his will and confined him in the trunk of his vehicle for over 16 hours in sub-zero temperatures. Furthermore, the court expressly considered--and rejected--the testimony from Gordon's expert at the sentencing hearing to

the effect that Gordon played a minor role in Fox's kidnapping, finding that "Gordon's participation in [the kidnapping] is equal to that of Grimes." On this record, it is clear that the District Court adequately considered Gordon's evidence that his role in the aggravated kidnapping was minimal compared to Grimes'; it was required to do no more. It is equally clear that the District Court considered the punishment it imposed commensurate with the nature and degree of harm caused by the offense as required by § 46-18-101(2)(a), MCA.

**¶48. Gordon also contends that the District Court failed to consider his evidence that his participation in the criminal venture resulted from his fear of Grimes. It is true that the court did not specifically address the fear factor in either its oral pronouuncement of sentence or written judgment and sentence. It also is true, however, that the evidence before the court in that regard was conflicting: Dr. Stratford reported that Gordon was "fearless," while Dr. Sachsenmaier opined that Gordon's kidnapping-related acts arose from his dependency on, and fear of, Grimes. Gordon's counsel candidly conceded that the extent of Gordon's fear could not be known. The court was not obligated to accept Dr. Sachsenmaier's testimony. Moreover, § 46-18-101(3)(d), MCA, requires only that judges retain discretion to consider mitigating circumstances. Thus, even if the court accepted Dr. Sachsenmaier's opinion regarding Gordon's fear of Grimes, it was not required to use that opinion to mitigate Gordon's sentence.**

**¶49. Next, Gordon contends that the District Court did not consider his significant cooperation with law enforcement officials throughout the case. It is true that the court did not expressly state that it had considered Gordon's cooperation, but Gordon cites to no authority requiring the court to itemize each piece of evidence presented and either accept or reject it. Nor was the court required to "state its reasons for deviating from the application of [the offered mitigating evidence] at sentencing," Gordon's unsupported argument to the contrary notwithstanding. That § 46-18-101(3)(d), MCA, requires judicial discretion to consider mitigating circumstances simply does not translate into a requirement that sentencing courts accept all evidence offered in mitigation and either use all such evidence to mitigate a defendant's sentence or explain why it did not do so. Moreover, the State clarified that it had considered Gordon's cooperation in entering into the plea agreement containing the 80-year imprisonment recommendation ultimately adopted by the court.**

**¶50. Finally, Gordon argues that the District Court's sentencing findings were**

insufficient under the § 46-18-102(3)(b), MCA, requirement that the sentencing court "clearly state for the record the reasons for imposing the sentence" and under State v. Stumpf (1980), 187 Mont. 225, 609 P.2d 298, and State v. Goulet (1996), 277 Mont. 308, 921 P.2d 1245. Again, we disagree.

¶51. The District Court's reasons for the sentence imposed were clearly stated. They included the nature of the offense and degree of harm caused, Gordon's criminal history and lack of rehabilitative prospects, the protection of society and the necessity of making Gordon responsible and accountable for his acts. Section 46-18-102(3)(b), MCA, requires no more.

¶52. Nor do the cases on which Gordon relies support his contention that the District Court's findings were insufficient. In *Stumpf*, the sentencing court apparently provided no rationale for the 3-year sentence it imposed. *Stumpf*, 187 Mont. at 226, 609 P.2d at 298-99. As a result, the defendant's entitlement to know why the particular sentence was imposed was not met and, indeed, this Court was left to guess at why the trial court had made its decision. *Stumpf*, 187 Mont. at 226, 228, 609 P.2d at 299. In *Goulet*, the sentencing court stated both orally and in its written sentence that the defendant's sentence was imposed at the recommendation of the prosecutor and the probation officer, and that it had taken into account the defendant's prior record and long history of contact with the legal system as a juvenile. We held that the court's statement of reasons for the sentence was sufficient to comply with both § 46-18-102(3)(b), MCA, and *Stumpf*. *Goulet*, 277 Mont. at 310, 921 P.2d at 1246. Here, the District Court's statement of reasons for Gordon's sentence was more extensive than that at issue in *Goulet* and, as a result, we conclude that the District Court complied with the statutory requirement of a clear statement of its reasons for imposing the sentence.

¶53. In summary, then, we hold that the District Court did not fail to comply with statutory sentencing requirements in sentencing Gordon.

B. Excessive sentence

¶54. Gordon also argues generally throughout his contentions about statutory sentencing violations that the sentence imposed on him was unduly harsh under all the circumstances. As stated above, however, we review sentences for legality only. *Romannose*, 281 Mont. at 94, 931 P.2d at 1311 (citations omitted). The sentence

**imposed on Gordon was well within the range prescribed by § 45-5-303(2), MCA, for the offense of aggravated kidnapping and met the other statutory requirements discussed above. Accordingly, we hold that the District Court legally sentenced Gordon. To the extent Gordon's complaints relate to the equity of his sentence, those complaints are properly addressed to the Sentence Review Division of this Court.** *Romannose*, **281 Mont. at 94, 931 P.2d at 1311 (citations omitted).**

¶55. Affirmed.


/S/ KARLA M. GRAY


We concur:


/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER