FILED

05/14/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0648

DA 21-0648

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2024 MT 101

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

WILLIAM JEROME CARNES,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DC-19-49
Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Bjorn Boyer, Assistant
Attorney General, Helena, Montana

          Eileen Joyce, Butte-Silver Bow County Attorney, Kelli Johnson Fivey,
Deputy County Attorney, Butte, Montana

Submitted on Briefs:  September 13, 2023

Decided:  May 14, 2024

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Defendant William Jerome Carnes appeals the August 10, 2021 order denying his "Motion to Dismiss: In Accordance With [the] Interstate Agreement on Detainers" and the subsequent Judgment of the Second Judicial District Court, Silver Bow County, on Carnes's plea of guilty to an amended charge of criminal endangerment pursuant to a plea agreement with the State. Concluding that Carnes failed to preserve his right to appeal the District Court's denial of his motion to dismiss, we accordingly affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 On October 22, 2018, Carnes was arrested on suspicion of driving under the influence of alcohol or drugs. The State charged Carnes by Information in February of 2019 with felony DUI for a fourth or subsequent offense; misdemeanor resisting arrest; and misdemeanor driving without a valid liability insurance policy in effect. Carnes retained a local attorney, who was present for his arraignment on March 21, 2019. Carnes entered pleas of not guilty to the three charges contained in the State's Information, and the court set dates for a final pretrial conference on June 11, 2019, and a jury trial on June 24, 2019. During Carnes's arraignment, the District Court advised him that "[y]ou may appeal any of the pretrial rulings following a guilty plea."

¶3 After Carnes failed to appear for his June 11, 2019 final pretrial conference, the District Court issued a warrant for his arrest. Carnes was served with the arrest warrant in Nevada after his July 2019 arrest in Douglas County, Nevada, for fleeing the scene of an

2

accident. On October 2, 2019, Carnes was sentenced to the Nevada Department of Corrections for a term of 24 to 72 months.

¶4 On August 10, 2020, Carnes filed a pro se motion that he entitled "Motion for Speedy Trial or in the Alternative Dismissal for Lack of Speedy Trial and Timely Prosecution." Carnes cited as the bases for his motion the Sixth Amendment to the United States Constitution and Nevada Revised Statutes, § 178.556(2). Carnes advised that he was currently serving a term of imprisonment in the Nevada Department of Corrections and asserted that "the responsibility of having the [Defendant] transported lies with the marshal[] of the City Butte, Montana and/or with the [N]evada Department of Corrections." Carnes asserted:

> Therefore, the chief marshal[] and Silver Bow district attorney's office, being fully aware of the whereabouts of the [Defendant], against whom a [warrant] is pending must execute the command of said warrant[.]

Carnes attached six addenda to his motion, including a "Verification of Incarceration," signed by a caseworker at the prison where Carnes was incarcerated, that verified Carnes's earliest release date and his sentence expiration date and described Carnes's "sentence structure" as 24-72 months. One of his attachments also included a paragraph referring to Article III of the IAD and requested that the State return him to its jurisdiction within 90 days to resolve the outstanding charge.

¶5 In response to Carnes's pro se motion, the State acknowledged that the warrant issued from the District Court served as a detainer but asserted that Carnes "should be asserting his rights based on [§] 46-31-101, MCA[], the Interstate Agreement on

Detainers." The State argued that Carnes did not follow procedure as contemplated by statute to make a request for final disposition. The District Court agreed with the State and denied Carnes's motion because he had not "follow[ed] the procedure set forth by the State of Montana pursuant to § 46-31-101 of the Montana Code Annotated."

¶6 On December 23, 2020, the District Court appointed Carnes a public defender to represent him for the remainder of the proceedings. Through counsel, Carnes filed a motion on February 12, 2021, to dismiss the case for the State's failure to comply with the Interstate Agreement on Detainers. Carnes asserted that "there is no question that the State was made aware [of Carnes's Nevada incarceration] on August 10, 2020," when his pro se motion to dismiss for lack of speedy trial was filed and provided to the State by the clerk of court. The District Court denied Carnes's motion, concluding that the State was given improper notice as to Carnes's request for a final disposition.

¶7 After the District Court denied his February 2021 motion to dismiss, Carnes reached a plea agreement with the State. The agreement called for the State to file an Amended Information charging Carnes with a single count of criminal endangerment, to which Carnes would plead guilty. In the agreement, Carnes acknowledged that he "knowingly engaged in conduct that created a substantial risk of death or serious bodily injury in others by operating a motor vehicle while under the influence of alcohol." The plea agreement included a proper acknowledgment and waiver of rights. It set forth the ten-year maximum sentence for the amended charge and included the State's recommended sentence of a five-year commitment to the Montana Department of Corrections, with execution of all but

4

824 days suspended. The recommended sentence specified further that Carnes would receive credit for time already served in connection with the case in the amount of 824 days. It called for Carnes to be placed on probation and released from custody at the time of his change of plea so that he could return to Nevada, where he was then on parole. The agreement said nothing about the order denying Carnes's motion to dismiss.

¶8 Carnes appeared for his change of plea hearing on October 14, 2021. The District Court engaged Carnes in a standard colloquy to confirm that his change of plea was knowing, voluntary, and intelligent. Carnes acknowledged that he was aware of the rights he was waiving by pleading guilty and that he understood the impact of his guilty plea. During the colloquy, the District Court asked Carnes: "Do you understand that by pleading guilty, you're giving up your right to appeal your conviction?" Carnes responded: "What's appeal?" His response apparently went unnoticed, as the court proceeded with the colloquy, and neither Carnes nor his attorney raised the question again. Carnes acknowledged that he was satisfied with the services of his attorney, and defense counsel confirmed with the court his satisfaction that Carnes understood his constitutional rights and that his waiver of those rights was knowing and voluntary. The District Court accepted Carnes's guilty plea and later sentenced him in accordance with the plea agreement.

## STANDARD OF REVIEW

¶9 A district court's denial of a motion to dismiss in a criminal case presents a conclusion of law over which we exercise de novo review. *State v. Watts*, 2016 MT 331, ¶ 7, 386 Mont. 8, 385 P.3d 960 (citation omitted).

5

**DISCUSSION**

¶10     "Montana's long standing jurisprudence holds that 'where a defendant voluntarily and knowingly pleads guilty to an offense, the plea constitutes a waiver of all non-jurisdictional defects and defenses, including claims of constitutional rights violations which occurred prior to the plea.'"  *Watts*, ¶ 9 (quoting *State v. Lindsey*, 2011 MT 46, ¶ 19, 359 Mont. 362, 249 P.3d 491).  *See also State v. Westfall*, 2024 MT 99, ¶ 17, ___ Mont. ___, ___ P.3d ___; *State v. Spreadbury*, 2011 MT 176, ¶ 11, 361 Mont. 253, 257 P.3d 392; *State v. Pavey*, 2010 MT 104, ¶ 11, 356 Mont. 248, 231 P.3d 1104; *State v. Violette*, 2009 MT 19, ¶ 16, 349 Mont. 81, 201 P.3d 804; *State v. Kelsch*, 2008 MT 339, ¶ 8, 346 Mont. 260, 194 P.3d 670; *State v. Rytky*, 2006 MT 134, ¶ 7, 332 Mont. 364, 137 P.3d 530; *State v. Gordon*, 1999 MT 169, ¶ 23, 295 Mont. 183, 983 P.2d 377; *State v. Turcotte*, 164 Mont. 426, 428, 524 P.2d 787, 788-89 (1974).  Consequently, after the plea, the defendant may attack only the voluntary and intelligent character of the plea, any jurisdictional defects, and any specified adverse pretrial rulings he has reserved the right to appeal.  *See Violette*, ¶ 16 (citations omitted).  In this regard, § 46-12-204(3), MCA, provides that "[w]ith the approval of the court and the consent of the prosecutor, a defendant may enter a plea of guilty or nolo contendere, reserving the right, on appeal from the judgment, to review the adverse determination of any specified pretrial motion."

¶11     Carnes argues that the District Court's statement at his March 2019 initial appearance—that he could appeal any adverse pretrial rulings after a change of plea— secured his right to appeal the denial of his motion to dismiss.  We are not persuaded by

this argument. First, that statement was correct; under the law, Carnes *could* appeal adverse pretrial rulings. But in order to do so, he needed to reserve that right *with the approval of the court and the consent of the prosecutor*. Relatedly, the court made the remark more than two years before the parties agreed to a plea deal; as noted, the plea agreement says nothing about Carnes's reservation of the right to appeal the adverse pretrial ruling. Attempting to save the issue on appeal, Carnes makes the argument that although "the written plea agreement contained no waiver of the right to appeal pre-trial rulings[,] [t]he State cannot create a new waiver of defendant protections outside the bounds of the written plea agreement and plea colloquy."

¶12 Carnes has it backwards. "The language of the statute . . . clearly indicates that a claim must be specifically *reserved* in order to be appealable, not that a claim is automatically appealable unless it is expressly *waived*." *Pavey*, ¶ 12 (emphasis in original). The right to appeal, or waiver of that right, is not among the rights of which a defendant must be informed before the court accepts a plea of guilty. Section 46-12-210(1), MCA. *See State v. Otto*, 2012 MT 199, ¶ 18, 366 Mont. 209, 285 P.3d 583 (reaffirming that "the rights listed in [§ 46-12-210(1), MCA contain] the only advisement of rights a district court is required to give" before accepting a guilty plea and rejecting Otto's claim that his prior convictions were infirm because the trial court failed to advise him of, among others, his right to appeal); *State v. Peterson*, 2013 MT 329, ¶ 28, 372 Mont. 382, 314 P.3d 227 ("A district court is not required to advise the defendant about issues not covered by the statute such as the right to appeal, the right to speedy trial or the right to object to evidence."). "It

7

follows that the right to appeal from an adverse pre-plea ruling is waived unless it is specifically reserved." *Spreadbury*, ¶ 11 (citing *Pavey*, ¶ 12). As we explained in *Spreadbury*, "[p]ermitting a party who does not contest the court's authority to convict and punish him to bring a later proceeding in which he claims his conviction was improper would undermine the finality of plea agreements and society's desire to encourage compromise resolution of criminal cases." *Spreadbury*, ¶ 12 (internal quotations and citations omitted).

¶13 Carnes's plea agreement contained no language reserving the right to appeal after his guilty plea. Carnes points to nothing in the record to establish that he had either the consent of the prosecutor or approval of the court to appeal the denial of his motion to dismiss. He did not comply with the statutory requirements to reserve the right to appellate review of the adverse pretrial ruling.

## CONCLUSION

¶14 Carnes failed to preserve for appeal the District Court's denial of his motion to dismiss. The judgment of the District Court is affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JIM RICE

Justice James Jeremiah Shea, dissenting and specially concurring.

¶15 I do not take issue with the Court's reliance on our precedents that advisement of the waiver of the right to appeal is not required to be included in the colloquy. However, "[w]hen determining if a defendant entered a plea voluntarily and whether a district court erred in denying a motion to withdraw a plea, we examine 'case-specific considerations.'" *State v. McFarlane*, 2008 MT 18, ¶ 17, 341 Mont. 166, 176 P.3d 1057. In this case, the District Court asked Carnes if he understood he was giving up his right to appeal his conviction by pleading guilty, to which Carnes responded with the question: "What's appeal?" After entering his guilty plea, Carnes timely appealed the District Court's denial of his motion. Under these very case-specific facts, I would address the merits of Carnes's appeal. I would nevertheless affirm the District Court's denial of Carnes's motion on its merits.

¶16 As the Court notes, Carnes's pro se motion was entitled "Motion for Speedy Trial or in the Alternative Dismissal for Lack of Speedy Trial and Timely Prosecution" ("First Motion to Dismiss"). Carnes cited as the bases for his motion the Sixth Amendment to the United States Constitution and Nevada Revised Statutes, § 178.556(2). Carnes advised that he was currently serving a term of imprisonment in the Nevada Department of Corrections and asserted that "the responsibility of having the [Defendant] transported lies with the marshal[] of the City Butte, Montana and/or with the Nevada Department of Corrections." Carnes asserted:

> Therefore, the chief marshal[] and Silver Bow district attorney's office, being fully aware of the whereabouts of the [Defendant], against whom a [warrant] is pending must execute the command of said warrant[.]

9

¶17 While acknowledging that the warrant issued from the District Court served as a detainer on Carnes, the State asserted that Carnes "should be asserting his rights based on [§] 46-31-101, MCA[], the Interstate Agreement on Detainers." After identifying the specific areas in which the State contended Carnes's First Motion to Dismiss was deficient, the State concluded its response by asserting:

> [T]he Defendant did not follow procedure as contemplated by statute to make a request for final disposition. The Defendant has failed to comply with the IAD statute to trigger the 180-day time frame, and as such, his speedy trial clock has not yet begun to tick.

¶18 In denying Carnes's First Motion to Dismiss, the District Court held:

> Since the Defendant generally asserts his right to a speedy trial in the State of Montana, yet is subject to custody in the State of Nevada, the Defendant must follow the procedure set forth by the State of Montana pursuant to § 46-31-101 of the Montana Code Annotated. Based on the unfulfillment of statutory requirements by the Defendant, as required by Montana statute, the Court hereby:
>
> ORDERS that the Motion to Dismiss is DENIED.

¶19 After being appointed a public defender, Carnes filed a motion for production, but otherwise took no action until February 12, 2021, when he filed a "Motion to Dismiss In Accordance with Interstate Agreement on Detainers" ("Second Motion to Dismiss"). In his Second Motion to Dismiss, Carnes asserted that "there is no question that the State was made aware [of Carnes's Nevada incarceration] on August 10, 2020 when an improper pro se motion to dismiss for lack of speedy trial with attachments was filed and provided to the State by the clerk's office." While acknowledging that he "improperly filed a motion to dismiss for lack of speedy trial due to his pro se status and misunderstanding of the law,"

10

Carnes asserted that this improper motion "clearly meets a request for final disposition as contemplated under the [IAD]." The District Court denied Carnes's motion, concluding that the State was given improper notice as to Carnes's request for a final disposition.

¶20 The IAD constitutes a contract between states and the federal government, enacted to "encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." Section 46-31-101, art. I, MCA. The IAD requires cooperation between states in which the prisoner is already incarcerated—the "sending state"—and the state in which the untried indictment, information, or complaint is pending—the "receiving state." Section 46-31-101, art. II, MCA. Montana has been a party to the IAD since 1963.

¶21 Art. IX of the IAD states "[t]his agreement shall be liberally construed so as to effectuate its purposes." Section 46-31-101, art. IX, MCA. In that spirit, we have held that a prisoner seeking to invoke the procedures of the IAD to effectuate the disposition of the charges against them may still benefit from the IAD even when they do not strictly comply with the substantive and procedural requirements of the IAD. *State v. Seadin*, 181 Mont. 294, 297-298, 593 P.2d 451, 453 (1979). In *Seadin*, we adopted the doctrine of substantial compliance where a prisoner bypasses state officials to make a request under the IAD themselves and endorsed the reasoning that "[r]elief should not be denied [to] a defendant when officials of the sending state fail to comply with the provisions to which they are bound." *Seadin*, 181 Mont. at 297, 593 P.2d at 454 (citing *Rockmore v. State*, 519 P.2d 877, 879 (Ariz. Ct. App. 1974)).

11

¶22 Following the United States Supreme Court's decision in *Fex v. Michigan*, 507 U.S. 43, 113 S. Ct. 1085 (1993), we adopted the Court's holding that the IAD's 180-day speedy trial clock does not commence until the prosecutor and appropriate court have received actual notice of the prisoner's request for speedy trial pursuant to the IAD. *State v. Dodson*, 2009 MT 419, ¶ 41, 354 Mont. 28, 221 P.3d 687. *Dodson* is instructive in the present case. In *Dodson*, the defendant was incarcerated in a federal prison in Texas when three felony charges and a misdemeanor were filed against him in Missoula County. *Dodson*, ¶ 8. An arrest warrant was issued which was transmitted to Dodson at the Texas prison. *Dodson*, ¶ 8. In November 2005, Dodson filed a request for a speedy trial under the IAD with the Texas prison officials, but Montana did not receive it because the Texas prison officials failed to forward it. *Dodson*, ¶ 10. The Texas prison officials later advised Dodson that his speedy trial request had not been forwarded to Montana, but when they offered him another opportunity to file his request, he declined. *Dodson*, ¶ 10. Instead, in the Spring of 2006, Dodson filed a pro se motion to dismiss the charges against him in Missoula County Justice Court, contending the State's failure to bring him to trial in Montana within 180 days of filing the charges against him required dismissal under the IAD. *Dodson*, ¶ 10. The State responded that it never received a speedy trial request under the IAD and claimed that Dodson failed to properly file his request. *Dodson*, ¶ 10. The Justice Court agreed and denied the motion to dismiss. *Dodson*, ¶ 10.

¶23 In April of 2007, Dodson filed a second motion to dismiss in District Court based on the State's failure to comply with the IAD, again alleging the State's failure to bring

12

him to trial in Montana within 180 days of his request for a final disposition of his pending charges. *Dodson*, ¶ 17. The District Court denied the motion. *Dodson*, ¶ 20.

¶24 On appeal, Dodson acknowledged that he did not file a second IAD request once he learned that the Texas prison officials had not forwarded his first request to Montana. *Dodson*, ¶ 34. Analogous to this case, though, Dodson contended the District Court nevertheless had notice by virtue of his motion to dismiss pursuant to the IAD in the Justice Court in August 2006, more than six months before his trial in District Court. *Dodson*, ¶ 34. The State responded that once Dodson learned that authorities in Montana did not receive his speedy trial request from Texas, Dodson should have taken further steps to send his request to the prosecutor and the District Court. *Dodson*, ¶ 35. Instead, the State argued, Dodson did nothing but wait until two days before trial in District Court to file a motion to dismiss based on a speedy trial request under the IAD, and that Dodson's motion to dismiss in Justice Court did not constitute notice that triggered the 180-day time limit. *Dodson*, ¶ 35.

¶25 We affirmed the District Court's denial of Dodson's motion to dismiss. We agreed with the State's argument that "Dodson did not inform the District Court and prosecutor of his request for a speedy trial under the IAD until 2 days before trial, and that the 180-day speedy trial provision of the IAD was not violated." *Dodson*, ¶ 42.

¶26 Similar to Dodson's argument that his motion to dismiss pursuant to the IAD in Justice Court should have constituted notice that commenced the 180-day time limit, *Dodson*, ¶ 34, Carnes argues that his "written motion requesting dismissal of his charges [First Motion to Dismiss] along with attachments from Nevada corrections officials

13

satisfied the Interstate Agreement on Detainers and required trial be held within 180 days." Just as we rejected Dodson's argument that his denied motion to dismiss pursuant to the IAD in Justice Court should have started the 180-day time limit on his District Court trial, similar reasoning applies here. The District Court denied Carnes's motion to dismiss because it did not fulfill the statutory requirements of the IAD. Similar to Dodson, Carnes took no action after his First Motion to Dismiss was denied other than to wait until the 180 days ran out and then filed his Second Motion to Dismiss, arguing that his First Motion to Dismiss should have constituted a request under the IAD that commenced the 180-day time limit.

¶27 When a defendant does all he can to comply with the provisions of the IAD, and substantially complies with the IAD's procedures, this compels the State to obtain custody of the defendant in accordance with the IAD's provisions. *Seadin*, 181 Mont. at 298, 593 P.2d 453. In keeping with the liberal construction of the IAD to effectuate its purposes, we do not require a prisoner to dot every "i" or cross every "t" to be considered in substantial compliance. But we must consider the circumstances of each case to determine substantial compliance. *Seadin*, 181 Mont. at 298, 593 P.2d 453. The circumstances of this case are that Carnes's First Motion to Dismiss did not invoke the IAD as a basis for his motion, nor did it even reference the IAD other than in one of his several attached addenda. In its response to Carnes's First Motion to Dismiss, the State was the party to first raise the IAD and assert that this was the statutory scheme pursuant to which Carnes could assert his right to a speedy trial, but that he had failed to comply with its provisions. The District Court agreed and denied Carnes's First Motion to Dismiss. Carnes took no

14

action in response to the District Court's denial of his First Motion to Dismiss other than to wait until the 180 days had lapsed and then filed his Second Motion to Dismiss on the basis that his First Motion to Dismiss should have started the clock.

¶28 Based on the case-specific factors of this case, I would not hold that Carnes waived his right to appeal the District Court's denial of his Second Motion to Dismiss. On the merits, however, I would hold that the District Court did not err by denying Carnes's Second Motion to Dismiss.

/S/ JAMES JEREMIAH SHEA

Justice Laurie McKinnon dissenting.

¶29 While I do not take a position on whether Carnes has preserved his right to appeal, I note that Carnes's request for resolution of the Montana detainer was the only issue raised at trial. Carnes pled guilty after it was clear he would not succeed on his motion. The denial of his motion is the only issue Carnes raises on appeal. I would be inclined towards Justice Shea's position that the record does not demonstrate Carnes waived his right to appeal and address what I believe to be a significantly erroneous interpretation of the IAD and our precedent. I note that there is neither a majority to find waiver nor a majority interpreting the IAD and addressing Carnes's claims. There is only a majority to affirm, by just four votes, but on two different rationales—neither of which is controlling. This, in my opinion, is unfortunate. The record is fully developed, the District Court addressed the issue, and it is unclear that Carnes understood he was waiving all his

15

rights when he entered his plea. Justice Baker's opinion relies exclusively on Carnes's failure to reserve an issue and § 46-12-204(3), MCA.

¶30 I would conclude that Carnes's first Motion to Dismiss filed pro se on August 10, 2020, invoked the provisions of the IAD. The District Court, after acknowledging that Carnes was invoking his right to a speedy trial under the IAD, nonetheless denied his Motion to Dismiss on September 8, 2020, concluding that Carnes had not submitted the proper paperwork. However, Carnes was effectively without counsel as retained counsel indicated following the omnibus hearing that he would not continue representing Carnes until he received more money. On November 16, 2020, Carnes asked the court to appoint a public defender. When a public defender was appointed on December 23, 2020, and filed a second Motion to Dismiss based on violation of the speedy trial provision of the IAD, that motion was similarly denied by the court. The Special Concurrence concludes that "Carnes took no action in response to the District Court's denial of his First Motion to Dismiss other than to wait until the 180 days had lapsed and then filed his Second Motion to Dismiss. . . ." Special Concurrence, ¶ 27. In my view, the above timeline and facts do not support the Special Concurrence's conclusion—even if it was relevant under the IAD, which it is not—that Carnes could have perfected his request earlier. The 180-day speedy trial clock is triggered by delivery of the request to the prosecuting jurisdiction, not by subjective criteria such as whether the request could have been perfected earlier. Carnes was incarcerated in another state, had not received assistance from prison officials as contemplated by the IAD, and had no counsel. Further, it is undisputed the State and the District Court had actual notice from the date of Carnes's

16

First Motion to Dismiss that Carnes was invoking his speedy trial rights under the IAD. I would conclude that Carnes's pro se motion invoking his right to a speedy trial and his request to resolve the Montana charges fully satisfied the requirements of the IAD. To conclude otherwise conflicts with the fundamental purpose of the IAD which requires that it be liberally construed to affect its purpose. § 46-31-101, art. IX, MCA.

¶31    The origins of the IAD date back to 1948, when the Joint Committee on Detainers issued a report concerning the problems arising from the use of detainers and expressing five principles for guidance of prosecuting authorities and prison officials. These five principles served as the underpinnings of the IAD, and are as follows:

1. Every effort should be made to accomplish the disposition of detainers as promptly as possible.
2. There should be assurance that any prisoner released to stand trial in another jurisdiction will be returned to the institution from which he was released.
3. Prison and parole authorities should take prompt action to settle detainers which have been filed by them.
4. No prisoner should be penalized because of a detainer pending against him unless a thorough investigation of the detainer has been made and it has been found valid.
5. All jurisdictions should observe the principles of interstate comity in the settlement of detainers, and each should bear its own proper burden of the expenses and effort involved in disposing of the charges and settling detainers.

*United States v. Mauro*, 436 U.S. 340, 349-50, 98 S. Ct. 1834, 1842 (1978).

¶32    The IAD sets forth the findings upon which it is based and its purpose in Art. I. It provides that "charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints and difficulties in securing speedy trial of persons incarcerated in other jurisdictions, produce uncertainties which obstruct programs

17

of prisoner treatment and rehabilitation." § 46-31-101, art. I, MCA. The Special

Concurrence's decision is not faithful to the purpose of the IAD. The IAD's purpose is

not to protect prosecutions, but to provide a swift and certain means for resolving the

uncertainties and alleviating the disabilities associated with outstanding detainers. The

failure to recognize the harm suffered by a prisoner under detainer is apparent when the

Special Concurrence holds that Carnes did not use the proper form and then waited until

trial to make a second request. To arrive at such a conclusion profoundly misconstrues

the purpose of the IAD and the heavy burden a prisoner under detainer bears:

> [The] inmate is (1) deprived of an opportunity to obtain a sentence to run concurrently with the sentence being served at the time the detainer is filed; (2) classified as a maximum or close custody risk; (3) ineligible for initial assignments to less than maximum security prisons (i.e., honor farms or forestry camp work); (4) ineligible for trustee [sic] status; (5) not allowed to live in preferred living quarters such as dormitories; (6) ineligible for study-release programs or work-release programs; (7) ineligible to be transferred to preferred medium or minimum custody institutions within the correctional system, which includes the removal of any possibility of transfer to an institution more appropriate for youthful offenders; (8) not entitled to preferred prison jobs which carry higher wages and entitle [him] to additional good time credits against [his] sentence; (9) inhibited by the denial of possibility of parole or any commutation of his sentence; (10) cause anxiety and thus hindered in the overall rehabilitation process since he cannot take maximum advantage of his institutional opportunities.

*Carchman v. Nash*, 473 U.S. 716, 730 n. 8, 105 S. Ct. 3401 (1985). These harms are

substantial and well-recognized. See, e.g. *Smith v. Hooey*, 393 U.S. 374, 379, 89 S. Ct.

575, 577-78 (1969); *United States v. Ford*, 550 F. 2d 732, 737-40 (2d Cir. 1977) (citing

cases). The Special Concurrence fundamentally misunderstands these stakes on the

prisoner's side when it holds that a pro se request for speedy resolution of the detainer was

18

inadequate without specifying its insufficiencies, particularly given that both the State and the District Court had actual notice of Carnes's request.

¶33     The IAD sets forth the procedures by which a state may obtain trial for a prisoner incarcerated in another jurisdiction and by which a prisoner may obtain a speedy trial of his detainer. Article III of the IAD contains a speedy trial provision and reads as follows:

> (1) Whenever a person has entered upon a term of imprisonment in a penal institution or correctional institution of a party state and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information, or complaint on the basis of which a detainer has been lodged against the prisoner, the prisoner shall be brought to trial within 180 days after he shall have cause to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of imprisonment and the prisoner's request for a final disposition to be made of the indictment, information, or complaint; provided that for good cause shown in open court, the prisoner or the prisoner's counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.
>
> (2) The written notice and request for final disposition referred to in subsection (1) hereof shall be given or sent by the prisoner to the warden, commissioner of corrections, or other official having custody of the prisoner, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court by registered or certified mail, return receipt requested.

Section 46-31-101, art. III, MCA.

¶34     Here, Carnes was imprisoned in Nevada for the felony offense of failing to stop at the scene of an accident and sentenced to a term of 24 months to 72 months. The amount of time Carnes would serve depends on a system of good time credits deducted from the

maximum term of 72 months for peaceful behavior, educational obtainment, and participation in certain programs. Nev. Rev. Stat. Ann. § 209.4465. Because of Carnes's detainer, he was denied access to prison programming which could have reduced his Nevada sentence. The Montana warrant was served on Carnes in Douglas County, Nevada on July 3, 2019. A return of the warrant was filed with the District Court on July 8, 2019. The State invoked the procedures of the IAD by filing its warrant. Carnes made a request, pursuant to 46-31-101(2), Art. III, MCA, of the Nevada Department of Corrections to process his IAD speedy trial request. However, Nevada prison officials represented to Carnes that the detainer was for a parole violation, which would not be covered by the IAD, and that the Montana warrant did not adequately describe the charges. Accordingly, Nevada refused to comply with the provisions of subsection (2) and refused to provide Carnes standard IAD forms.

¶35 Carnes, without any assistance from counsel, filed a pro se request for final disposition of his Montana charges. His motion was titled "Motion for Speedy Trial or in the Alternative Dismissal for Lack of Speedy and Timely Prosecution." In the motion itself, Carnes asked for disposition of his charges, or dismissal in the alternative and removal of the warrant. He asked to be returned to Montana under "Article III of the IAD" explaining he was serving a term of imprisonment in Nevada and could not transport himself to the courthouse in Montana. Carnes attached multiple addendums to his motion:

A. A copy of the arrest warrant.

B. A letter from Carnes's retained counsel, Frank Joseph, indicating Carnes had exhausted his retainer.

20

C.  A verification of his incarceration in the Nevada Southern Desert Correctional Center, signed by a prison employee case worker, explaining Carnes's sentence length, the earliest release date, and the sentence expiration date. A telephone number was also provided.

D.  A letter from the Butte City Court.

E.  A motion listing his Montana charges and a request to quash the Montana warrant.  A request to obtain custody of Carnes "pursuant to Article III of the I.A.D. and return petitioner to your jurisdiction in the time prescribed by law, but in no case any later than (90 days) from your receipt of this notice; to adjudicate, resolve & finalize your current demands, alleged crime or any possible civil offenses as mentioned."

F.  A signed request to the charging prosecutor in Butte, Montana that provided: (1) Carnes's name and Nevada inmate number; (2) The name and address of the Nevada prison where he was being held; (3) The name of his convicted offense in Nevada, which was Duty to Stop at the Scene of an Accident; (4) The county where the offense occurred, Douglas County; (5) that he was sentenced on October 2, 2019 to a term of 24 months to 72 months and a minimum parole eligibility date of June 1, 2022; (6) The name of his Montana charge, that it occurred in Butte-Silver Bow County, the case number, and a note of failing to appear; and (7) A statement of "I hereby demand a hearing and trial of said criminal action."

G.  Signed declarations that Carnes was being truthful in his statements under penalty of perjury.

¶36    I am not sure what more we can demand or expect of a pro se prisoner seeking to invoke his speedy trial rights under the IAD.  Indeed, Carnes filed his motion with the District Court and the State filed a written response arguing that Carnes had not followed the proper IAD forms, obtainable only from prison officials, for asserting his speedy trial rights under the IAD.  The District Court denied Carnes's motion "Based on the unfulfillment of statutory requirements by the Defendant, as required by Montana statute." Thus, undisputedly, both the State and the District Court understood that Carnes was

21

requesting relief under the speedy trial provision of the IAD and had received actual notice of his request.

¶37    The legislative history of the IAD and case law discussion of it agree that one of the major reasons for its passage was to remedy the situation caused by states lodging detainers against a prisoner and merely waiting until his release before pursuing the underlying charges. That is exactly what the State has done here. A detainer status is to be distinguished from the mere presence of untried and otherwise unpursued criminal charges in a party state. An unpursued charge does not wreak havoc by hampering rehabilitation prospects or preventing the reduction of prison times in jurisdictions with indeterminate sentencing, such as Nevada. The IAD was intended to force jurisdictions with detainers outstanding to try the underlying criminal charge within 180 days or be barred. Clearly the provisions within Article III of the IAD pertaining to a prisoner's request for a speedy resolution of his detainer are directed at providing notice to the party state through *delivery* of the request. The parties do not dispute that *delivery* was made to the State and the District Court of Carnes's request.

¶38    The Special Concurrence misconstrues our holding in *Dodson*. Special Concurrence, ¶ 22. *Dodson* was concerned whether the request for final disposition under the IAD was ever *delivered* to Montana, not the content of the request itself. *State v. Dodson*, 2009 MT 419, ¶ 34, 354 Mont. 28, 221 P.3d 687. Drawing on *Fex*, this Court in *Dodson* held that "delivery is the key concept" and that Dodson had not delivered his request to the prosecutor, and therefore the prosecutor was not even aware of the request, until 2 days before trial. *Dodson*, ¶¶ 38-42. The effective date of delivery, having

22

occurred 2 days before trial meant that there remained 178 days under the IAD to try Dodson; hence, there was no speedy trial violation. *Dodson*, ¶ 42. Here, there is no dispute Carnes's request was *delivered* to the State and District Court—both had *actual notice* of the request and, indeed, responded to it. Additionally, the certificate verifying Carnes's Nevada prison status was signed by a Nevada prison caseworker and adequately set forth all information available that pertained to Carnes's Nevada prison sentence. The Special Concurrence does not explain how Carnes's request was insufficient, only that Carnes waited too long to effectively invoke his speedy trial rights. There simply is no dispute that delivery of the request was made to both the State and court. There is no requirement in the IAD provisions or our precedent that particular forms be filed for a defendant to invoke his right to a speedy trial.

¶39 While, in my opinion, Carnes actually did comply with the speedy trial requirements of the IAD, this Court has nonetheless set a standard of not demanding precise technical compliance with every aspect of the IAD, which would undermine the IAD's purpose of disposing of detainers in a timely manner. In *Seadin*, we concluded there was substantial compliance with the IAD *even though there was no certificate from a prison official* of the custodial jurisdiction. *State v. Seadin*, 181 Mont. 294, 296-98, 593 P.2d 451, 452-53 (1979). We explained that Seadin did all that he could to comply with the provisions of the IAD and held that he had substantially complied with its provisions. *Seadin*, 181 Mont. at 298, 593 P.2d at 453. In *Seadin*, as here, Montana had notice of Seadin's request because Seadin, with the aid of another prisoner, drafted a motion and had it delivered on the state. *Seadin*, 181 Mont. at 295, 593 P.2d at 452. Because he did

23

not receive any assistance from prison officials, as here, he did not include the certificate regarding his custodial imprisonment. *Seadin*, 181 Mont. at 295, 593 P.2d at 452. Article IX of the IAD provides that "[t]his agreement shall be liberally construed to effectuate its purposes." The Special Concurrence's decision ignores the purpose of the IAD and our clear and undistinguishable precedent established in *Seadin*.

¶40     While I would hold that Carnes's pro se motion filed on August 10, 2020, fully complied with the requirements for making a speedy trial request under the IAD, to the extent there is any deficiency alleged, I would hold under *Seadin* that Carnes's request substantially complied with its provisions. To conclude otherwise exalts form over substance, is contrary to the IAD's purpose, and is simply an ill-conceived interpretation of our precedent and the statutory provisions of the IAD.


/S/ LAURIE McKINNON


Justices Ingrid Gustafson and Dirk Sandefur join in the dissenting Opinion of Justice Laurie McKinnon.


/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR

24